Slade R. Metcalf (SM 8360)
Rachel F. Strom (RS 9666)
Hogan & Hartson LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000

*Attorneys for Defendant*
*Dow Jones & Company, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

| | |
|---|---|
| BRETT MCKENZIE, : | |
| : | |
| Plaintiff, : | |
| : | Case No. 08 CV 3623 (SAS) |
| – against – : | |
| : | |
| DOW JONES & COMPANY, INC., : | |
| : | |
| Defendant. : | |

--------------------------------------------------------------------X

### DECLARATION OF SLADE R. METCALF IN SUPPORT OF
### DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

I, **SLADE R. METCALF**, declare as follows:

1.      I am a partner in the law firm of Hogan & Hartson LLP, counsel for defendant

Dow Jones & Company, Inc. ("Dow Jones").  I have personal knowledge of the facts set forth in

this Declaration and, if called as a witness, could and would testify competently to such facts

under oath.  I submit this Declaration in support of Dow Jones' Motion to Dismiss the Complaint

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

2.      Plaintiff filed his Complaint in this action on April 15, 2008.  A true and correct

copy of the Complaint is annexed hereto as Exhibit "A."

3.      Pursuant to a stipulation between the parties, Dow Jones has until May 21, 2008

to move, answer or otherwise respond to the Complaint.

4.     On April 28, 2008, pursuant to Rule III(B) of the Rules and Procedures of the Honorable Shira A. Scheindlin, I sent Plaintiff's counsel a letter on behalf of Dow Jones to inform Plaintiff of Dow Jones' intent to file the instant motion to dismiss and of the grounds for that motion.  On May 8, 2008, I received a letter from Plaintiff's counsel informing me that he would oppose Dow Jones' motion to dismiss the Complaint.

I declare under the penalty of perjury under the laws of the United States of America and the State of New York that the foregoing is true and correct and that this Declaration was executed in New York, New York on May 21, 2008.


  s/  Slade R. Metcalf
                     **SLADE R. METCALF**

\\\NY - 031767/000001 - 1082929 v1

**<u>EXHIBIT A</u>**

**To the Declaration of Slade R. Metcalf
in Support of Defendant's Motion To Dismiss the Complaint**

JUDGE SCHEINDLIN

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

BRETT MCKENZIE,                          :

                Plaintiff,          :     CIVIL ACTION NO. **'08 CIV 3623**

                v.                  :

DOW JONES & COMPANY, INC.                :     JURY TRIAL DEMANDED

                Defendant.         :

## CIVIL ACTION: COMPLAINT

       Plaintiff Brett McKenzie, by his attorney Richard M. Mortner, Esq., for his

complaint against defendant respectfully alleges as follows:

### NATURE OF THE ACTION

    1.      Plaintiff is a 36 year-old single parent, raising an eight-year old son in a

small town in New Hampshire.

    2.      In 1983, plaintiff Brett McKenzie, at age 12, was sexually molested by a

Roman Catholic priest.

    3.      In 2003, Brett McKenzie joined a class action against the Roman Catholic

Diocese of Manchester, N.H. As a result, plaintiff entered into a confidential agreement in

November 2003 with the Diocese of Manchester, NH, and plaintiff received $20,000.

    4.      In 2005, Brett McKenzie was maliciously attacked by The Wall Street

Journal in an article written by Dorothy Rabinowitz. In the article, The Wall Street Journal

identified Brett McKenzie as an individual who had claimed to be sexually abused by a priest for the purpose of extracting a monetary settlement from the Diocese of Manchester.

5.    To most readers the article portrayed Brett McKenzie, as a liar and a cheat.

6.    To those who knew Brett to be an honorable man, the article revealed for the first time plaintiff's closely guarded secret that as a child he had been sexually abused by a priest.

7.    Plaintiff seeks damages for prima facie tort, because defendant intentionally inflicted harm to plaintiff, causing special damages, without excuse or justification, by publication of the subject article, an act which would otherwise not have been actionable herein.

## VENUE AND JURISDICTION

8.    Subject matter jurisdiction exists based on 28 U.S.C. §1332, because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because the controversy is between citizens of different states.

9.    Personal jurisdiction over defendant is proper based on New York Civil Practice Law and Rules §§ 301 and 311, and Rule 4 of the Federal Rules of Civil Procedure, subparagraph (e).

10.    Personal jurisdiction and venue in this action are predicated on 28 U.S.C. § 1391(a) (1), since defendant is deemed to reside in the Southern District of New York, pursuant to 28 U.S.C. § 1391(c).

2

## THE PARTIES

11.     Plaintiff, Brett McKenzie, is a resident of the State of New Hampshire.

12.     At all times hereinafter mentioned defendant Dow Jones & Company, Inc. ("Dow Jones") was and still is a corporation organized and existing under the laws of the State of Delaware.  Dow Jones' principal place of business is in the City of New York, County of New York, and State of New York.

13.     Upon information and belief, at all the times hereinafter mentioned, defendant Dow Jones owned and published a certain newspaper known as the "The Wall Street Journal."

14.     Upon information and belief, at all the times hereinafter mentioned, The Wall Street Journal was published daily, and enjoyed a large sale and circulation to the public in print and internet editions in the City and State of New York, throughout the United States and internationally.

15.     The Wall Street Journal was extensively circulated in and widely read by residents of the city in which plaintiff resided at all times relevant hereto, Farmington, NH, and its environs, including the City of Manchester, N.H., and throughout the State of New Hampshire.

## Count I

### a.  **Defendant's Wrongful Conduct.**

16.     On or about April 27, 2005, defendant Dow Jones published and circulated in The Wall Street Journal a false, defamatory, malicious, and libelous article

3

(hereinafter "The Wall Street Journal's article") of and concerning plaintiff, a copy of which is

attached hereto as Exhibit "A," which article contains in its opening three paragraphs, *inter alia*,

the following matter, to wit:

> Nine years after he had been convicted and sent to prison on
> charges of sexual assault against a teenage boy, Father Gordon
> MacRae received a letter in July 2003 from Nixon Peabody LLP, a
> law firm representing the Diocese of Manchester, N.H. Under the
> circumstances — he was a priest serving a life term -- and after all he
> had seen, the cordial-sounding inquiry should not perhaps have
> chilled him as much as it did.
>
> "…an individual named Brett McKenzie has brought a claim
> against the Diocese of Manchester seeking a financial settlement as a
> result of alleged conduct by you," the letter informed him. There was
> a limited window of opportunity for an agreement that would release
> him and the Diocese from liability. He should understand, the lawyer
> added, that this request didn't require Fr. MacRae to acknowledge in
> any way what Mr. McKenzie had alleged. "Rather, I simply need to
> know whether you would object to a settlement agreement."
>
> Fr. MacRae promptly fired a letter off through his lawyer,
> declaring he had no idea who Mr. McKenzie was, had never met him,
> and he was confounded by the request that he assent to any such
> payment. Neither he nor his lawyers ever received any response. Fr.
> MacRae had little doubt that the stranger -- like others who had
> emerged, long after trial, with allegations and attorneys, and,
> frequently just-recovered memories of abuse -- got his settlement.

17.     Four days after publication of The Wall Street Journal's article that is the

subject of this action, The New Hampshire Union Leader, a newspaper published and widely

circulated in New Hampshire, wrote an article about The Wall Street Journal's article. The New

Hampshire Union Leader article reported,

> Rabinowitz yesterday defended the Journal's naming of one of
> MacRae's accusers in the civil class-action lawsuit. 'I'll tell you why
> because the cloak of anonymity is the worst encouragement to a false
> abuse climate; that is the problem.'

18.     Thus, spoke Dorothy Rabinowitz, a member of the editorial board of The

Wall Street Journal, and so the Wall Street Journal "outed" Brett McKenzie.

4

**b. Defendant Inflicted Harm on Plaintiff: Defamation by Implication.**

19.     Defendant inflicted harm on plaintiff by publicly creating the implication that plaintiff had fraudulently claimed to be sexually abused by a priest for the purpose of extracting a monetary settlement from Roman Catholic Bishop of Manchester, Inc., known as the Diocese of Manchester.

20.     Although the statements in The Wall Street Journal's article were likely not false, *e.g.*, Brett McKenzie did bring a claim against the Diocese of Manchester seeking a financial settlement as a result of alleged sexual abuse by Gordon MacRae, and MacRae may have denied ever having met Brett McKenzie, the article nevertheless, gave rise to false suggestions, impressions and implications.

21.     Considering the article as a whole and in context the contested statements were reasonably susceptible of a defamatory connotation.

22.     The contents of Exhibit "A," so published by defendant, was intended to convey and did convey to the community at large the false impression that plaintiff was dishonest, disreputable, deceptive and had wrongfully accused a priest for his own financial gain, the acts attributed to plaintiff being immoral, dishonest and even criminal in nature.

23.     In fact, The Wall Street Journal's article induced an evil opinion of Brett McKenzie in the minds of right-thinking persons, and deprived him of their friendly intercourse in society. As a result of The Wall Street Journal's article, Plaintiff was exposed to public contempt, ridicule, aversion and disgrace.

c.  **Defendant's Harmful Conduct was Intentional.**

24.  The defamatory implication contained in The Wall Street Journal's article in Exhibit "A," to the extent that it is completely false and untrue as described above, was known or should have been known by defendant to be false, in that defendant made no reasonable effort to determine the accuracy, truthfulness or correctness of MacRae's statements contained in Exhibit "A" and to so report that in The Wall Street Journal's article.

25.  The Wall Street Journal's article identified the Diocese of Manchester, and it identified attorneys involved in the priest sexual abuse cases in New Hampshire, which arose in the last decade.

26.  However, The Wall Street Journal's article identified only one out of more than two hundred individuals who claimed to have been child victims of sexual abuse by priests of the Diocese of Manchester – that victim was Brett McKenzie.

27.  Moreover, The Wall Street Journal's article identified only one source for the public character assassination of Brett McKenzie, Gordon MacRae, a convicted, pedophile priest who was serving a prison term of 33½ to 67 years.

28.  In March of 2003, the New Hampshire Attorney General's Office issued a comprehensive report summarizing a year-long investigation of clergy sexual abuse cases involving the Diocese of Manchester. Those cases involved 40 priests. In that report Gordon MacRae was specifically identified by the New Hampshire Attorney General's Office as one of the "worst of the worst" among priests who had, over the years, sexually molested minors.

29.  Nevertheless, The Wall Street Journal's article accepted MacRae's tale as uncontroverted. Neither Rabinowitz nor anyone else from The Wall Street Journal ever

6

contacted the Diocese of Manchester, its attorney, Brett McKenzie, or his attorney to fact check MacRae's claim that he never met Brett McKenzie.

30.    Neither Rabinowitz nor anyone else from The Wall Street Journal ever asked for comment from the Diocese of Manchester, its attorney, Brett McKenzie, or his attorney on MacRae's claim that he never met Brett McKenzie.

31.    Had defendant undertaken any of the aforementioned basic investigative steps regarding MacRae's statement, it would have found that in 1983, a 12 year-old Brett McKenzie was a student at the Sacred Heart School in the Parish of Our Lady of Miraculous Medals in Hampton, N.H., where, at that time Gordon MacRae was a young priest, and a teacher of Brett McKenzie's.

32.    Had defendant undertaken any of the aforementioned basic investigative steps, it would have been told that there was significant evidence that MacRae sexually abused Brett McKenzie, that Brett McKenzie's claims were meritorious, that MacRae had consistently denied any and all of the many allegations of sexual abuse against him spanning decades, and that MacRae's claim of innocence in connection with Brett McKenzie's claim was utterly without merit.

33.    Thus, in publishing the statements containing defamatory implications quoted in paragraph 16, defendant acted with intent and in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

7

**d.  Defendant's Harm to Plaintiff was Without Excuse or Justification.**

34.    Defendant knew the severity of the accusations and implications made against plaintiff in The Wall Street Journal's article, *i.e.*, the implication that plaintiff made a fraudulent claim of sexual abuse against the Diocese of Manchester, and, with actual malice, defendant intentionally published the story knowing that the accusations could have been verified or determined to be false prior to publication with a minimum of effort.

35.    Upon information and belief, at the time of the aforesaid publication, defendant was motivated by actual malice in that defendant knew that The Wall Street Journal's article contained strong implications against the plaintiff that were false and untrue, or were published with reckless and wanton disregard of whether they were false and untrue.

36.    Based upon all of the foregoing, including the statements of Rabinowitz reported in The New Hampshire Union Leader, set forth in paragraph 17 above, defendant intended to cause harm to Brett McKenzie out of disinterested malevolence.  The complained of acts of defendant were without justification.

37.    No aspect of pecuniary self interest or public interest was served by defendant's one-sided publication of MacRae's story about Brett McKenzie.  The complained of acts of defendant were done by defendant solely for the purpose of causing harm to plaintiff.

38.    Because the complained of acts of defendant might otherwise be deemed lawful, complete relief cannot be afforded to plaintiff by application of traditional tort remedies.

39.    Based upon the foregoing, defendant has committed a prima facie tort against plaintiff, which because of its malicious motive calls for legal remedy.

8

e.  **Defendant Inflicted Harm on Plaintiff:**
   **Public Exposure of Plaintiff's Victimization.**

40.    Defendant inflicted harm on plaintiff by publicly exposing plaintiff as a likely child victim of sexual abuse at the hands of a priest.

41.    For over 20 years Brett McKenzie kept MacRae's sexual abuse of him secret.  Brett McKenzie held onto his secret because he wanted to avoid embarrassment, humiliation, pity, contempt and ridicule from his friends and coworkers and he wanted to protect his parents from feeling as if they had failed to protect him as a child.

42.    The Diocese of Manchester understood the injury that public disclosure of Brett McKenzie's victimization would cause to him.  So the Diocese, in settling Brett McKenzie's claim, agreed to enter into a confidentiality agreement with him, which allowed only Brett McKenzie to control disclosure of the abuse he had suffered.

43.    In fact, the settlement agreement between Brett McKenzie and the Diocese of Manchester utilized confidentiality language that was specifically approved by the U.S. Conference of Bishops for inclusion in clergy abuse settlements. The US Conference of Bishops has explained that its confidentiality language is required for "grave and substantial reasons," and is intended specifically for the purpose of avoiding "the emotional harm that would result from disclosure" of the identity of clergy abuse victims.

44.    By allowing only victims like Brett McKenzie to disclose their abuse, the U.S. Conference of Bishops and the Diocese of Manchester expressly recognized that disclosure against the private wishes of the victim was inherently injurious to the victim and would impede the victim's recovery.

45.    Notwithstanding the foregoing, defendant publicized the fact that Brett McKenzie had been sexually abused by a priest as a child based on nothing more than Gordon

9

MacRae's seemingly random selection of Brett McKenzie out of dozens of claimants against him.

46.    As a result, Brett McKenzie was forced to explain to family, friends, and co-workers what had happened, and was forced to relive a very painful trauma.

47.    The myriad responses to Brett McKenzie regarding defendant's revelation, that Brett McKenzie had been a victim of sexual abuse by a trusted priest, varied from utter disbelief, to disgust, to criticism.

48.    As a result of the identification of Brett McKenzie in The Wall Street Journal's article in connection with being a victim of priest sexual abuse, Brett McKenzie was exposed to embarrassment, humiliation, disgrace, contempt and ridicule.

f.    **Defendant's Exposure of Plaintiff's Victimization was Intentional.**

49.    This confidentiality agreement that Brett McKenzie signed with the Diocese of Manchester was well known to defendant.

50.    In fact, upon information and belief, Rabinowitz encouraged MacRae to identify victims for The Wall Street Journal's article, which resulted in MacRae revealing Brett McKenzie's name to Rabinowitz.

51.    In publishing Brett McKenzie's name in connection with being a victim of priest sexual abuse, defendant acted with intent and in a grossly irresponsible manner. Moreover, defendant acted with intent and without due consideration for the ethical principles and standards as regards the publication of the names of victims of crimes and of victims sexual abuse that are ordinarily followed by responsible members of the news media and parties engaged in information gathering and dissemination.

10

**g.   Defendant's Harm to Plaintiff was Without Excuse or Justification.**

52.    Defendant knew the harmfulness of its confidential disclosures, to wit that Brett McKenzie was a child victim of a priest's sexual abuse; and with actual malice, defendant intentionally published the story.

53.    Upon information and belief, at the time of the aforesaid publication, defendant was motivated by actual malice in that defendant knew that the article and matters contained therein concerning the plaintiff so published, were confidential and highly sensitive – combining such profound issues as sexual abuse and religion -- and were published with reckless and wanton disregard of the ethical standards that prevail in the news media regarding the identification of victims of crimes and sexual abuse.

54.    Based upon all of the foregoing, including the statements of Rabinowitz reported in The New Hampshire Union Leader, set forth in paragraph 17 above, defendant intended to cause harm to Brett McKenzie out of disinterested malevolence.  The complained of acts of defendant were without justification.

55.    No aspect of pecuniary self interest or public interest was served by revealing Brett McKenzie's name as a victim or alleged victim of child sexual abuse by a priest. The complained of acts of defendant were done by defendant solely for the purpose of causing harm to plaintiff.

56.    Because the complained of acts of defendant might otherwise be deemed lawful, complete relief cannot be afforded to plaintiff by application of traditional tort remedies.

57.    Based upon the foregoing, defendant has committed a prima facie tort against plaintiff, which because of its malicious motive calls for legal remedy.

### h.  **Defendant's Harmful Conduct caused Special Damages to Plaintiff.**

58.    As a result of the publication of The Wall Street Journal's article and the acts of defendant in connection therewith, plaintiff have been held up to public contempt, ridicule, disgrace, and prejudice; he has suffered great mental pain and anguish; and has been irreparably injured in his good name, and social standing, and has lost the esteem and respect of his friends, acquaintances, coworkers and members of his own family.

59.    As a result of the aforesaid deliberate conduct of defendant, defendant inflicted severe mental pain and anguish on Brett McKenzie.

60.    This severe mental pain and anguish was magnified by the shocking implication to most readers that plaintiff fabricated a claim of sexual abuse against the Diocese of Manchester and against a priest.

61.    This severe mental pain and anguish was also magnified by the shocking disclosure to plaintiff's friends and family that plaintiff had been sexually abused as a child by a priest.

62.    Also as a result of the aforesaid deliberate conduct of defendant, plaintiff began to suffer from anxiety related disorders.  Plaintiff was made sick, nervous and unable to properly eat and digest his food, and he lost weight, suffered from vomiting, insomnia and depression and became despondent.

63.    These disorders were magnified by plaintiff's sudden public infamy, which resulted from The Wall Street Journal's article.

64.    These disorders were also magnified by the shocking disclosure to plaintiff's friends and family of plaintiff's secret childhood experience of sexual abuse by a priest.

65.    Consequently, plaintiff was compelled to obtain medical aid in an endeavor to restore his physical and mental health.  Plaintiff saw a doctor and the doctor prescribed medications for plaintiff and recommended further treatment.

66.    As a result, plaintiff incurred medical bills.

67.    By reason of the acts of defendant aforesaid, plaintiff has been subjected to suffering in mind and body and has been injured and damaged and is entitled to an award of special damages according to proof at the time of trial, but in excess of the jurisdictional limit of this Court.

68.    Plaintiff still suffers from the same psychological and physical injuries; and Plaintiff is informed and believes that by reason of his injuries plaintiff will continue to suffer the same psychological and physical injuries for a period of time to come, to plaintiff's further damage.  Consequently, plaintiff is entitled to a further award of special damages according to proof at the time of trial, but in excess of the jurisdictional limit of this Court.

69.    By reason of the foregoing, the aggravated, malicious and vile nature of defendant's wrongful act and to prevent repetition, by serving as a warning to others, particularly in the media, and to protect the public, and because plaintiff has been subjected by defendant to insult, injury and indignity, plaintiff is entitled to an award of exemplary and punitive damages in the amount of $7,700,000, an amount that is sufficient to deter defendant Dow Jones & Company, Inc., and others, from such conduct in the future.

WHEREFORE, plaintiff respectfully requests the following relief:

(i)     On Count I, against defendant Dow Jones & Company, Inc. for prima facie tort, special damages according to proof at the time of trial, and punitive damages in the amount of $7,700,000;

(ii)    Together with interest and the costs and disbursements of this action, and reasonable attorney's fees; and

(iii)   Such other relief the Court may deem reasonable and just.

Dated: April 15, 2008
       New York, New York

                              Respectfully submitted,


                              Richard M. Mortner (RM-0019)
                              40 Broad Street, 5th Floor
                              New York, NY 10004
                              Tel. 212-480-2181

                              Attorney for Plaintiff Brett McKenzie

14

JOURNAL.    OPINION    WEDNESDAY, APRIL 27, 2005

# A Priest's Story

**By Dorothy Rabinowitz**

Nine years after he had been convicted and sent to prison on charges of sexual assault against a teenaged boy, Father Gordon MacRae received a letter in July 2003 from Nixon Peabody LLP, a law firm representing the Diocese of Manchester, N.H. Under the circumstances—he was a priest serving a life term—and after all he had seen, the cordial-sounding inquiry should not perhaps have chilled him as much as it did.

"... an individual named Brett McKenzie has brought a claim against the Diocese of Manchester seeking a financial settlement as a result of alleged conduct by you," the letter informed him. There was a limited window of opportunity for an agreement that would release him and the Diocese from liability. He should understand, the lawyer added, that this request didn't require Fr. MacRae to acknowledge in any way what Mr. McKenzie had alleged. "Rather, I simply need to know whether you would object to a settlement agreement."

Fr. MacRae promptly fired a letter off, through his lawyer, declaring he had no idea who Mr. McKenzie was, had never met him, and he was confounded by the request that he assent to any such payment. Neither he nor his lawyers ever received any response. Fr. MacRae had little doubt that the stranger—like others who had emerged, long after trial, with allegations and attorneys, and, frequently, just-recovered memories of abuse—got his settlement.

By the time he was taken off to prison in 1994, payouts for such claims against priests promised to surpass the rashest dreams of civil attorneys. The promise was duly realized: In 2003, the Boston Archdiocese paid $85 million for some 54 claimants. The Portland, Ore., Archdiocese, which had already handed over some $53 million, declared bankruptcy in 2004, when confronted with $155 million in new claims. Those of Tucson and Spokane soon did the same.

Fr. MacRae's own Diocese of Manchester had the distinction, in 2002, of being the first to be threatened with criminal charges. According to the New Hampshire Attorney General's office, the state was prepared to seek indictments on charges of child endangerment. To avert prosecution, the diocese signed an agreement much publicized by the AG's office, acknowledging that it was likely that the state could obtain a conviction. (Attorneys familiar with the issue had their doubts about that.) Meanwhile, claims and payments continued apace. By the end of 2004, the Diocese audit showed a total of $22,210,400—thus far—in settlements.

That the scandals which began reaching flood tide in the late '90s had to do with charges all too amply documented, and that involved true predators, no one would dispute. Nor can there be much doubt that these scandals, their nonstop press coverage, and the irresistible pressure on the Church to show proof of cleansing resulted in a system that rewarded false claims along with the true. An expensive arrangement, that—in more ways than one.

No one would be more aware of that than Gordon MacRae, whose infuriated response to the Nixon Peabody attorney included reference to "the settlement game." He didn't trouble to mention the cost, the game had exacted in his case. For the last few years, he has shared a seven-and-a-half by 14 foot cell with one other inmate at the New Hampshire State Penitentiary. For this, he is thankful as only a prisoner can be who had had the experience of being housed, his first five years in prison, with eight men in a cell built for four. Every inmate ever placed in such a cell lives in fear of having to return and he is no exception, he notes. Still it had been easier on him than some around him.

"I had an inferior life—others had less."

At St. Bernard's Parish in New Hampshire, the patient, energetic young Fr. MacRae was the one chosen for work with troubled teenagers, invariably assigned to drug addiction centers. Through it all he remained oblivious to snares that might lie in the path of a priest for the young and needy. He was soon to be educated.

In the spring of 1983, 14-year-old Lawrence Carnevale cried bitterly upon learning that Fr. Gordon, whom he adored, was to move to another parish, and drew himself onto the priest's lap. He made phone calls to Fr. Gordon at his new parish. Within a few months, the youth told his psychotherapist that Fr. Gordon had kissed him. Three years later—expelled from his Catholic High School for carrying a weapon—he told a counselor that the priest had troubled him and run his hands up his leg. At roughly the same time, he accused a



male teacher at St. Thomas High School of making advances to him, then made the same allegation against his study hall teacher at Winnacunnet High School. Police Detective Arthur Wardell,

> ## The trial of Father Gordon MacRae.

who investigated, concluded in his report that this was a young man who backed in the attention such charges brought him, and that there was no basis to them.

Lawrence Carnevale nonetheless had more revelations of abuse a decade later. In 1993, he alleged that Fr. MacRae had held a gun on him, and had forced him to masturbate while licking the barrel. Clearly, his narrative of trauma had undergone extraordinary transformation. Prosecutors and their experts invariably explain such dazzling enrichment in the charges as being the result of an accuser's newfound courage. They would have occasion to make numerous explanations of this kind throughout Fr. MacRae's trial. Though Lawrence Carnevale's own case would not come before a court, his charges would play their role in bolstering a 1994 criminal case

brought against the priest. He would have the satisfaction, as well, of hearing the presiding judge cite the torment and lifelong pain Lawrence Carnevale had suffered at the hands of Fr. MacRae.

A decade earlier, his stories had also had their effect on Fr. MacRae, who was unnerved by them, depressed by the suspicions they raised. He had no idea of the disturbances yet to come. In 1988, 17-year-old Michael Russi, a patient at the Spofford Chemical Dependency Hospital, asked to meet with him. Not long into their talk, which was supposed to be about his addiction, the man became agitated, exposed himself, and began telling him about his other sexual encounters at the hospital. Fr. MacRae walked quickly away, his memories of the Carnevale accusations still fresh, and declared he was about to open the door—a threat that chastened the patient enough to rip up. Before walking away, though, he had a final, warning query for the priest: "This was confession, right?"

Gordon MacRae now recalls the words with some wryness, though at the time he was far from sanguine. He discussed the incident with his superiors, along with his fears about having to disclose, to police, details of an encounter the Spofford patient had declared a "confession." Msgr. Frank Christian offered reassurances. Fr. MacRae was suspended nevertheless, pending an investigation. Two months later, state police who conducted an investigation declared the case unfounded and closed it—which did little to keep the Spofford incident from feeding the suspicions of Detective James McLaughlin, sex crimes investigator for the Keene police department, then just beginning what was to become a considerable career in his field, particularly for his stings involving child molesters.

Other factors, too, had played their role in focusing his attention on the priest, not least a letter sent by a Catholic Youth Services social worker after the Spofford Hospital incident. The letter informed the investigator of authoritative information the worker had received that Fr. MacRae was a suspect in the murder and sex-mutilation of a Florida boy. It was a wholly unproved word from Florida police, revealing the story as bogus, caught up with the social workers and police in Keene. Meanwhile, Detective McLaughlin was busy interrogating some 22 teenage boys whom Fr. MacRae knew or had counseled. Despite determined, repeated questioning, he could find no one with any complaints about the priest.

He did, however, have teenager Jon Plankey, who claimed that Fr. MacRae had attempted to solicit sex from him. The charges stemmed from a convoluted conversation in which the Plankey boy, saying he would do an thing for the money, asked for a loan of $75, which Fr. MacRae declined to give. Jon Plankey had already made a molestation complaint against a Job Corp supervisor, and would go on to charge a church choir director. He also charged a man in Florida with attempted abuse.

As the Plankey saga showed, the role played by the prospect of financial settlement from the church tended to announce itself with remarkable speed. Jon Plankey's mother worked for the Keene Police. Even before Fr. MacRae was aware of the accusations, the then-Msgr. (now Auxiliary Bishop) Frank Christian received a call from Mrs. Plankey informing him that she had learned that Fr. MacRae was being investigated on solicitation charges involving her son, and that a settlement would be in order if the diocese were to avoid a lawsuit and lawyers. The Plankeys claims were duly settled out of court (after added claims that the priest had taken pornographic pictures of Jon.)

Fr. MacRae, summoned to meet with Detective McLaughlin, was informed that there was much evidence against him—including the Spofford Hospital incident—that the police had an affidavit for an arrest, and that it would be in everybody's best interest for him to clear everything up and sign a confession. On the police tape, an otherwise bewildered-sounding Fr. MacRae is consistently clear about one thing—that he is in no way solicited the Plankey boy for sex or anything else. "I don't understand," he says more than once, his tone that of a man who feels that there must, indeed, be something for him to understand about the charge and its causes that eludes him. On a leave of absence from his duties at the parish, depressed over the return of undiagnosed seizures in the recent year—which had not plagued him since early childhood—he listens as the police assure him that he can save all the bad publicity.

"Our concern is, let's get it taken care of, let's not blow it out of proportion . . . You know what the media does," they warned. He could avoid all the stories, protect the church, let it all go away quietly. At one point Fr. MacRae asked for the recorder to be turned off for a moment, lest his answer to questions about a male parishioner's visit to him embarrass a woman in the community. From here on the interview continued unrecorded. As far as Fr. MacRae could see, the police had knowledge of a terrible wrong he had done the Plankey boy that could endanger him, psychologically, for life. He recalls that when he thought to ask for a lawyer—a request Detective McLaughlin denies, today, that Fr. MacRae made—he was told that would only muddy the waters. Here was his opportunity to take care of things, avoid arrest, an eruption of media attention damaging to the church. After four hours of interrogation, Fr. MacRae agreed to sign a statement that he had endangered the welfare of a minor, a misdemeanor. Before affixing his signature, he saw that the detective had added the names of three more boys with molestation charges. Nobody, he was told, is going to believe you solicited just one boy.

Shortly after, Sgt. Hal Brown, Detective McLaughlin's partner in the interrogation, alerted reporters to the confession, via a press release, which produced the inevitable storm of media publicity. "Though no sexual acts were committed by MacRae," it noted, "there are often varied levels of victimization." The release went on to commend Officer McLaughlin for his excellent work.

*Ms. Rabinowitz is a member of the Journal's editorial board. This is the first of two parts, the second of which appears tomorrow.*