UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

|  |  |  |
|---|---|---|
| | : | |
| BRETT MCKENZIE, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 08 CIV 3623 |
| | : | (SAS) (JCF) |
| - against - | : | |
| | : | |
| DOW JONES & COMPANY, INC. | : | |
| | : | |
| Defendant. | : | |
| | : | |

---

## DECLARATION OF RICHARD M. MORTNER
## IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

RICHARD M. MORTNER, declare as follows:

1.      I am an attorney admitted to the practice of law in the State of New York and before the United States District Court for the Southern District of New York.  I represent the Plaintiff, Brett McKenzie, in the above-captioned matter.  I am fully familiar with the underlying facts and circumstances and I make this Declaration in opposition to Defendant's Motion to Dismiss the Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

2.      Annexed as exhibits hereto, and described below, are five documents that Plaintiff relied upon in framing the Complaint.  It is respectfully requested that the Court consider these documents in connection with the instant 12(b)(6) motion, in accordance with *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir.1991), cert. denied, 503 U.S. 960, 112 S.Ct. 1561 (1992).

3.      In 2003, Plaintiff, Brett McKenzie, joined a class action against the Roman Catholic Diocese of Manchester, N.H.  As a result, on November 3, 2003, Plaintiff entered into a

confidential settlement agreement with the Diocese of Manchester, NH.  Mr. McKenzie received $20,000 for the settlement.

4.      The Settlement Agreement and General Release entered into between Brett McKenzie and the Diocese of Manchester is quoted in the Complaint at ¶43 and is specifically referred to in the Complaint at ¶¶ 3, 42 and 49.  The Agreement is annexed hereto as Exhibit A. Plaintiff respectfully requests that the Court consider this document in connection with the instant 12(b)(6) motion.

5.      In March of 2003, New Hampshire's Office of the Attorney General issued a comprehensive report summarizing a year-long investigation of clergy sexual abuse cases involving the Diocese of Manchester.  Those cases involved 40 priests.  In that report Gordon MacRae was specifically identified by New Hampshire's Office of the Attorney General as one of the worst among priests who had, over the years, sexually molested minors.

6.      The Office of the Attorney General's report on the investigation of the Diocese of Manchester is specifically referred to in the Complaint at ¶28.  The section in the Office of the Attorney General's report that concerns Gordon MacRae is annexed hereto as Exhibit B. Plaintiff respectfully requests that the Court consider this document in connection with the instant 12(b)(6) motion.

7.      On April 29, 2005, two days after publication of The Wall Street Journal's Article which is the subject of this action, The New Hampshire Union Leader, a newspaper published and widely circulated in New Hampshire, wrote an article about The Wall Street Journal's article. The New Hampshire Union Leader reported,

> Rabinowitz yesterday defended the Journal's naming of one of MacRae's accusers in the civil class-action lawsuit.  'I'll tell you why because the cloak of anonymity is the worst encouragement to a false abuse climate; that is the problem.'

8.      The above-mentioned article in The New Hampshire Union Leader is directly quoted in the Complaint at ¶17, and is specifically referred to at ¶¶36 and 54.  A copy of The New Hampshire Union Leader's article is annexed hereto as Exhibit C.  Plaintiff respectfully requests that the Court consider this document in connection with the instant 12(b)(6) motion.

9.      The Complaint alleges Plaintiff suffers from mental and physical disorders as a result of the mental pain and anguish caused by Defendant's conduct.  These injuries form the basis of Plaintiff's claim for special damages.

10.     In framing the allegations of special damages at ¶¶59-68 of the Complaint, Plaintiff relied in part upon Brett McKenzie's medical records from his primary treating physician at Family Care of Farmington, NH.  These medical records are annexed hereto as Exhibit D.   Plaintiff respectfully requests that the Court consider these records in connection with the instant 12(b)(6) motion.

11.     As evidence of Defendant's malevolent indifference to the harm it caused to Brett McKenzie by reporting his name in the article that is the subject of this action, the Complaint alleges that Defendant acted with reckless and wanton disregard of the ethical standards that prevail in the news media regarding the identification of victims of sexual abuse.  See Complaint at ¶¶51 and 53.

12.     In framing the allegations in the Complaint that pertain to the ethical standards that prevail in the news media regarding the identification of victims of sexual abuse, Plaintiff relied upon the Code of Ethics of the Society of Professional Journalists, which is annexed hereto as Exhibit E.  Plaintiff respectfully requests that the Court consider this document in connection with the instant 12(b)(6) motion.

13.     The Society of Professional Journalists, founded in 1909, is a national journalism organization that describes itself as "dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior."  The Society claims to have nearly 300 chapters across the United States, and a membership base of more than 9,000 members of the media.

14.     I declare under the penalty of perjury that the foregoing is true and correct and that this Declaration was executed in New York, NY, on June 6, 2008.


_____/s/_____
Richard M. Mortner

## SETTLEMENT AGREEMENT AND GENERAL RELEASE

This Agreement made this _3rd_ day of _November_, 2003, by and between

BRETT MCKENZIE an individual with an address at _11A Pleasant St. Carmefter NH B835_

and the ROMAN CATHOLIC BISHOP OF MANCHESTER, a corporation sole, of 153 Ash

Street, P.O. Box 310, Manchester, NH 03105-0310.

WITNESSETH that:

WHEREAS, Brett McKenzie had made claims against the Roman Catholic Bishop of

Manchester, a corporation sole, claiming damages for personal injury;

WHEREAS, the Roman Catholic Bishop of Manchester, a corporation sole, in good faith,

has agreed to avoid the expense and time of litigation proceedings, to resolve all of their

differences by this Agreement; to keep certain information completely confidential at Brett

McKenzie's sole request and that this Agreement adequately resolves all of the differences

between the parties and is meant to bring peace between them;

NOW, THEREFORE, Brett McKenzie and the Roman Catholic Bishop of Manchester, a

corporation sole, agree, for the consideration and upon the terms set forth in this Agreement, that:

1.      Brett McKenzie will terminate with prejudice his claim on account of the matters

referenced in this Agreement.

2.      Brett McKenzie does for himself, his heirs, executors, beneficiaries,

administrators, successors, and assigns (the foregoing releasing parties being hereafter referred to

as the "Releasors"), hereby release, remise and forever discharge, fully and finally, the Roman

Catholic Bishop of Manchester, a corporation sole, the Roman Catholic Bishop of Manchester,

the Diocese of Manchester, all parishes within the Diocese of Manchester, and Gordon MacRae,

their past, present and future officers, ministers, clerics, priests, bishops, directors, attorneys,

agents, servants, representatives, subsidiaries, partners, employees, predecessors, and successors

in interest and assigns, affiliates, and all other persons and/or entities to the extent that such other

person and/or entity is liable or could be deemed liable by, through, or under them (the foregoing

released parties being hereafter referred to as the "Releasees") of and from any and all past,

present and future cause and causes of action, all manner of actions, suits, demands, claims, debts,

sums of money, accounts, reckoning, bonds, bills, specialities, covenants, controversies,

judgments, agreements, premises, variances, trespasses, damages, execution, claims and liabilities

of whatsoever kind and nature, including, but not limited to, any and all claims for bodily or

personal injuries, mental anguish, psychological or emotional distress, property damage, medical

bills, lost wages, pain and suffering, loss of consortium, and any and all damages and expenses of

any nature whatsoever, past, present and future, foreseen and unforeseen, known or unknown,

which have been incurred or which may be incurred in the future, upon or by reason of any

matter, cause or thing whatsoever from the beginning of the world to the date of these presents.

Without limiting the generality of the foregoing, this Release specifically pertains to all events

complained of by Brett McKenzie with respect to matters involving sexual abuse by any

representative of the Roman Catholic Diocese of Manchester.

     3.     For grave and substantial reasons, including but not limited to, the emotional harm

that would result from such disclosure, Brett McKenzie has requested, and the Releasees have

agreed, that they and their agents, including counsel, will not, at any time, directly or indirectly,

publicize, divulge, discuss or disclose the name of Brett McKenzie nor the settlement amount

specifically paid to Brett McKenzie, it being understood that settlement amounts and ranges may

be disclosed without attribution to Brett McKenzie. The Releasees or their agents may disclose

such terms to their legal advisors, insurers, and/or accountants as may be necessary to receive

professional advice and then only if such persons are expressly made aware of this confidentiality

provision and agree in writing to be bound hereby, and except as otherwise compelled by final,

non-appealable order from a court of competent jurisdiction.

4.    In consideration of this Settlement Agreement and in consideration of Twenty Thousand Dollars ($20,000) and other good and valuable consideration, including psychological and/or pastoral counseling, Brett McKenzie hereby agrees to pay from the settlement proceeds herein described any and all medical bills, property damage claims, attorneys' fees, and medical, wage, attorney, workers and unemployment compensation liens, and any and all other claims or license, subrogation rights or other causes of action arising out of the events complained of by him. Brett McKenzie, for and in consideration of the herein mentioned sum of money, and for other good and valuable consideration, hereby agrees to indemnify and hold harmless the Releasees from any and all liens, including but not limited to, wage liens, workers and unemployment compensation liens, attorneys liens, PIP liens, medical liens, and from any and all subrogation rights and other claims and causes of action arising out of the events complained of which may exist or which may hereinafter accrue, or any claims made by any relative which is derivative of his claims.

5.    Brett McKenzie and the Diocese agree that the payment of the above-recited amount of Twenty Thousand Dollars ($20,000) shall be paid by the Diocese to Brett McKenzie in its entirety on or before March 31, 2004.

IN WITNESS WHEREOF, Brett McKenzie, having read carefully the foregoing Settlement Agreement and General Release and knowing and understanding its terms, signs the same as his own free act and deed this 3rd day of _December_, 2003.

_____
Peter E. Hutchins
Attorney for Brett McKenzie

_____
Brett McKenzie
Plaintiff

STATE OF NEW HAMPSHIRE
COUNTY OF HILLSBOROUGH

Personally appeared before me, Brett McKenzie, the above named individual, and made oath that the foregoing statements are true to the best of his knowledge and belief.

Before me,

11/03/03

~~Justice of the Peace~~/Notary Public
My Commission expires: _____

M103788.1

# AFFIDAVIT OF BRETT MCKENZIE

I, Brett McKenzie, do hereby depose and say as follows:

1. My name is Brett McKenzie and I reside at 11A Pleasant Street, Farmington, NH 03835. My date of birth is April 21, 1971.

2. I was sexually abused by Father Gordon MacRae of the Diocese of Manchester during the year of 1983.

3. The parish involved was Our Lady of Miraculous Medals in Hampton, NH.

4. The sexual abuse was a one time incident of over the clothes fondling whereby the priest forced me to fondle him.

5. Location of the abuse took place at the Sacred Heart School where I was a student.

The above statements are true to the best of my knowledge and belief.

Dated: _11-03-03_

STATE OF NEW HAMPSHIRE
COUNTY OF _Hillsborough_

Brett McKenzie

Sworn to, before me, by Brett McKenzie, that the above made statements are true to the best of his knowledge and belief.

Dated: _11/03/03_

~~Justice of the Peace~~/Notary Public
My Commission expires:

ROBERT R. THREETON
STATE OF
- MY -
COMMISSION
EXPIRES
DECEMBER 05,
2006
NEW HAMPSHIRE
NOTARY PUBLIC

**REPORT ON THE INVESTIGATION OF THE DIOCESE OF MANCHESTER**

**March 3, 2003**

Peter W. Heed
Attorney General

N. William Delker
Senior Assistant Attorney General

James D. Rosenberg
Assistant Attorney General

Office of the Attorney General
33 Capitol Street
Concord, N.H.  03301-6397
(603) 271-3671

## GORDON MACRAE

### I.    INTRODUCTION

Gordon MacRae is a 49 year old Diocesan priest. His priestly faculties were suspended in July 1988 after the Diocese learned of accusations that MacRae had verbally solicited a minor to engage in sex at Spofford Hall, a residential treatment facility for youth. (B3060). The Bishop had given MacRae permission to celebrate mass at Spofford Hall. (B3127). MacRae pled guilty to endangering the welfare of a child in November 1988, as a result of another incident in which MacRae verbally solicited a 14-year-old boy to engage in sexual conduct. (B3328; B8695-96). Prior to this incident, the Diocese was aware that MacRae had engaged in inappropriate sexual contact by kissing and hugging a minor in November 1983. (B3037).

MacRae was subsequently convicted in 1994 of one count of felonious sexual assault and four counts of aggravated felonious sexual assault based on conduct that occurred during "pastoral counseling" sessions at St. Bernard's parish in Keene where MacRae was a priest. See State v. MacRae, 141 N.H. 106, 107 (1996). The conduct for which he was convicted occurred between June and November 1983, although the victim did not come forward until 1993. Id.[1] In 1994, the defendant also pled guilty to sexual assault or attempted sexual assault of three other boys. (S-III at 153).[2] He is currently serving a sentence of 33 1/2 to 67 years in New Hampshire State Prison for his crimes. (State's Br. at 2).[3]

During the course of civil litigation against the Diocese and MacRae in the 1990s, the victims learned the facts surrounding MacRae's sexual abuse of minors and the Diocesan response to those allegations against MacRae. Because the victims had discovered through the civil litigation that the Diocese was aware of MacRae's 1983 misconduct but allowed him to continue in ministry, the State could not rely on the tolling provision of the statute of limitations. In other words, the statute of limitations for a charge of endangering the welfare of a minor expired one year after the victims learned of the Diocesan response to MacRae's allegations through the civil litigation in the 1990s. Accordingly, the State could not have pursued criminal charges against the Diocese for endangering the welfare of a minor based on the circumstances surrounding the Diocesan response to allegations against MacRae.

### II.    PSYCHOLOGICAL EVALUATION DURING SEMINARY
### AND ACCEPTANCE INTO THE PRIESTHOOD

In 1972, MacRae entered the Capuchin Order, a religious order affiliated with the Roman Catholic Church. (B6726). In 1978, MacRae decided that he wanted to leave the Capuchin Order and become a Diocesan priest. (B6748, B6755). Rev. John P. McHugh, the director of formation at St. Anthony's Friary in Hudson, New Hampshire wrote to Fr. Paul Groleau, Diocesan vocation director, on May 24, 1978, to express some reservation about MacRae's

---

[1] As discussed in further detail below, this victim was different from the victim that the Diocese was aware of in November 1983.
[2] Citation is to the sentencing hearing in State v. MacRae held over the course of three days in Cheshire County Superior Court in November 1994 followed by the volume number.
[3] Citation is to the State's brief to the New Hampshire Supreme Court in State v. MacRae.

fitness to be a priest. (B6749). While the Capuchin Order ultimately unanimously recommended MacRae for the priesthood, McHugh's letter to Fr. Groleau is significantly qualified about the recommendation. For example, McHugh writes that it might be acceptable if MacRae took "a shot at diocesan priesthood" and that the Diocese could allow him into the seminary and "see" what happens. Finally, McHugh's letter concludes that "[a]nother priest on the staff suggests that perhaps Gordon could profit from some professional counselling regarding the formation of relationships necessary for ministry. (Gordon has had some therapy before.)" (B6750).

On June 8, 1978, Fr. Paul Groleau, the Diocese's vocation director, sent Gordon MacRae for a psychological evaluation before he entered the seminary. (B3022). The evaluation begins by noting: "It appears that we are dealing with two different individuals." One of MacRae's personalities is "well-adjusted," the other is "insecure with evidence of serious anxiety and depression." (B3022). He also notes: "The feelings of anxiety, insecurity, isolation, detachment, and deprivation shown, are evidence of feelings of personal inadequacy and chronic maladjustment." (B3023). He also recognizes that "Gordon has an unresolved problem of sexual identification as heterosexual adjustment is conceived of as threatening and dangerous." (B3023-24). The psychologist notes: "It is difficult at this time to project into the future." (B3022). He concludes that MacRae should be accepted into the seminary on a trial basis. (B3022).

On July 27, 1978, the Rector of St. Mary's Seminary & University in Maryland wrote to Fr. Groleau and advised him that another therapist had evaluated MacRae's psychological test results and concluded that the seminary should not accept MacRae. (B3026). The rector rejected this recommendation because he "was relying heavily on [Groleau's] judgment and assessment." (B3026). Based on this reasoning, the second therapist changed his recommendation to "cautious acceptance." (B3026). The rector of the seminary left it up to the Diocese as to whether MacRae's acceptance should be conditioned on his agreement to attend counseling. He concluded that if the Diocese did not think it was necessary, "we can wait and see if Gordon's behavior might lead us to make such a recommendation." (B3026). That same day, the seminary sent MacRae his acceptance letter, which did not include any condition of counseling. (B3028-29).

## III.    ALLEGATIONS OF SEXUAL ABUSE OF MINORS BY MACRAE

### A.    MacRae's Sexual Contact with John Doe XII[4]

John Doe XII was born in 1969. Doe XII was raised as a devout Roman Catholic. He served as an altar boy and wanted to be a priest. He believed that a priest speaks for God.

Doe XII met MacRae when he was 13 years old in 1982. MacRae taught Doe XII's religious education classes at Our Lady of the Miraculous Medal parish. MacRae developed a close relationship with Doe XII. They spent a lot of time together in the parish rectory. Doe XII

---

[4] The following factual recitation is taken from a published order from the Hillsborough County Superior Court (Conboy, J.) regarding the application of the statute of limitations to a civil lawsuit filed by John Doe XII and others against the church in 1993. See [John Doe] et al. v. MacRae et al. (Hills. North Super. Ct. Aug. 2, 1996).

loved MacRae as if he was his father. He told MacRae that he loved him and MacRae told Doe XII that he loved him.

The physical contact between MacRae and Doe XII began when Doe XII sat on MacRae's lap. This developed into kissing on the lips. MacRae had conversations with Doe XII in the rectory while MacRae was naked. MacRae talked with Doe XII about masturbation and encouraged him to masturbate.

MacRae began to touch Doe XII's genitals in what MacRae called the "spider game." MacRae would pretend that his hand was a spider. He would make the spider first touch Doe XII's left leg, then his right leg. The "spider" would "get" the middle leg. This would result in MacRae rubbing and massaging Doe XII's penis from the outside of his clothing. MacRae played the spider game with Doe XII approximately a dozen times, including at the rectory and at Doe XII's home.

One time, MacRae was lying on top of Doe XII in a recliner in the rectory. MacRae kissed Doe XII and rubbed his genitals. On another occasion, Doe XII was sitting on MacRae's lap in the rectory. They were sitting in a recliner watching television and MacRae began kissing Doe XII. Fr. Gerald Boucher came into the room, saw them kissing, and immediately left without saying anything.

At some point in 1983, Doe XII told his teacher at school that MacRae was doing things that made him feel uncomfortable, but he was afraid to confront MacRae. The teacher told Doe XII to compose a letter to MacRae. Doe XII wrote the letter, which did not contain any detail, but was intended to get MacRae to stop. He left the letter for MacRae. MacRae later told Doe XII that he got his "dirty letter."

Doe XII told Fr. Boucher that "physical things" were going on with MacRae at the rectory that made him feel uncomfortable. He did not give Fr. Boucher any details about the abuse. According to Doe XII, Fr. Boucher responded by telling Doe XII that he should not worry about it because MacRae was leaving the parish soon. Meanwhile, the kissing and spider game continued.

According to Doe XII, in the fall of 1983, he told another priest who replaced Fr. Boucher, that he had had a physical relationship with MacRae. This priest responded by saying that Doe XII was making a very serious allegation, and that he should "go home and reconsider" what he was saying.

## B.    Doe XII's Disclosure of Sexual Abuse And Report To DCYS

Again in the fall of 1983, Doe XII began counseling with Judith Patterson, a clinical social worker from Catholic Charities. In October 1983, when Doe XII was 14 years old, he disclosed MacRae's conduct to Patterson. Doe XII asked Patterson if it was normal for a priest to kiss a boy on the mouth. (B7686). Doe XII was equivocal about whether MacRae had ever touched his genitals. (B7686). Patterson viewed Doe XII's allegations against MacRae as "clear cut sexual abuse" because of the fact that MacRae put Doe XII on his lap and kissed him in

violation of sexual boundaries. (B7687). Patterson told Doe XII that what MacRae had done was illegal and that the state authorities had to be notified.

Patterson immediately called her supervisor, Janet O'Connell, and met with her. Together they decided that the matter had to be reported to state authorities. O'Connell called Father Quinn, who was the director of Catholic Charities. Patterson spoke to Quinn. Patterson told Quinn that the allegations were "absolutely credible." She explained to Quinn the normal reporting and investigation procedures. At the time Patterson believed the abuse should be reported to the Portsmouth District Office of social services. (B7688). Quinn told her that the church had a different procedure for handling these matters. (B7691). He told her that the church's protocol was for the matter to be reported to the Bishop, who in turn would personally report the matter to the Commissioner of the Department of Welfare. (B7689).

Patterson told Quinn what the substance of Doe XII's allegations were. Initially, Quinn was very doubtful about whether Doe XII was telling the truth and did not want to report the matter. (B7690). Patterson told investigators: "He asked me several times whether I believed him and you know did I need to talk with Doe XII some more, to make sure that he was telling the truth." (B7690). Patterson was adamant that Doe XII was telling the truth and that she felt that this was a matter that required reporting to state authorities. (B7690). In response to Patterson's insistence, Quinn agreed to talk with Bishop Gendron about the allegation. (B7690). Patterson understood from her conversation with Quinn that "because it was a delicate issue that it was handled at the highest level." (B7691). In fact, Bishop Gendron did meet directly with Department of Welfare Commissioner Sylvio L. Dupuis. (B7410). According to Dupuis, he instructed Gendron that this matter needed to be reported to social services. (B7410). Dupuis then referred the matter to the Division of Children and Family Services. According to Dupuis, he had no further involvement in the matter. (B7410).

Despite Dupuis' statement that he met directly with Bishop Gendron, Msgr. Francis Christian asserted in sworn interrogatories filed in 1993 in conjunction with the civil law suits against the Diocese that: "Bishop Odore Gendron never, at any time, had any direct contact or communication with any employee of DCYS. All of the contacts with the State were conducted by Monsignor John Quinn." (B3192).

On November 21, 1983, Quinn wrote a letter to Fr. Christian about the allegations of sexual abuse by MacRae. (B3043). Quinn indicated that he was notified by Dr. Guertin-Ouellette and Judy Patterson from Catholic Charities that MacRae had "sexually abused two minor males" in Hampton during the past summer. (B3043).[5] Quinn explained that MacRae was currently in counseling with Dr. Guertin-Ouellette and would continue in counseling. Quinn informed Fr. Christian that Dr. Guertin-Ouellette told the Diocese that MacRae suffers from "a strong personality development deficiency and will require ongoing treatment." Quinn

---

[5] In the course of his therapy, Doe XII informed the counselor that another male child had been abused in a similar manner. He did not provide any further information about who that child was. (B10488). Some years later the Diocese expressed confusion about the reference to a second victim. Fr. Christian speculated that Doe XII might have indicated at the time that there was someone else who was abused or that there was a misunderstanding and that two instances of abuse with Doe XII was interpreted as abuse against two separate victims. (B3172). Apparently, there was a lapse of memory about the origins of the reference to the second victim.

132

concluded that he was going to meet with state officials and would "most probably file the official report with the Department of Health and Welfare." (B3043).

On November 23, 1983, Fr. Quinn met with Richard A. Chevrefils, Director of the Division of Welfare regarding Doe XII's allegations against MacRae. (B10487-88). Chevrefils wrote a memo regarding the meeting. He noted that MacRae was then in therapy which "apparently" was "positive at this time." Id. Chevrefils noted that Doe XII disclosed that another unknown male child was also subject to similar conduct. Id. Chevrefils also recognized that there were questions about MacRae's relationship with a boy named John Doe XIII. Id. Chevrefils recommended that Jeannette Gagnon further discuss the situation with Quinn, that the matter be referred to the Attorney General's Office, that there be follow-up care for the victim and family, and that there be a review of the situation with John Doe XIII. Id.

Jeannette Gagnon, an Administrator with DCYS, was also at the meeting between Chevrefils and Quinn. (B8881-82). Gagnon believed that Commissioner Dupuis was also present for the meeting. (B8882). According to Gagnon, Dupuis was very close to both the Bishop and Catholic Charities. (B8883). Gagnon characterized the meeting as "unusual." (B8882). She said that all other similar reports are assigned to social workers in the regional district offices. (B8882). She understood that the reason that the allegation was being handled by the central office was because it involved a Catholic priest. (B8883). Gagnon stated that she was under the impression that "they would be granted some consideration because it was important that they be seen being as cooperat[ive] with this investigation, wanting to get to the bottom of this and that it involved a Catholic priest and they were not really looking for, for any publicity and they would have wanted this to be something that they would be involved in and that they could handle it and it would be quiet." (B8883). She stated further: "I remember Father Quinn mentioning that[,] you know[,] very specifically that I would understand that this was a very serious matter and that it could[,] um, perhaps people wouldn't understand." (B8884). Gagnon remembers going back and forth with Quinn and emphasizing that she was very committed to the law and rules they had relative to investigations. (B8884). Gagnon did indicate that the Diocese understood that there was a reporting law and that they had to cooperate in the investigation. (B8884). She also stated that the Diocese was aware that if it became known that a priest had been molesting children over time and they had known about it and did not make a report as required by law, "it would be difficult for them and embarrassing." (B8884). The Diocese also made assurances that they would not impede the investigation in any way. (B8886).

On December 5, 1983, Fr. Christian wrote a memo to the file about a meeting he had with MacRae regarding Doe XII's allegations. (B3044). Christian met with MacRae regarding the incident discussed in the November 21 memo from Quinn. MacRae admitted the incident. He said he was under stress and found himself kissing the "young man." MacRae claimed he never had any homosexual incident or activity before.[6] Christian also noted that MacRae was undergoing alcohol counseling and therapy with Dr. Guertin-Ouellette. MacRae promised that if he did not succeed he would seek hospitalization. Christian told MacRae they were concerned

---

[6] This appears at odds with the psychological evaluation performed on MacRae prior to his admission into the seminary. That report indicates that MacRae "has an unresolved problem of sexual identification as heterosexual adjustment is concieved of as threatening and dangerous." (B3023-24).

about his "ability to function happily as a priest" and "the welfare of the people he was serving." Christian told MacRae that the Diocese had to report the incident. Christian told MacRae "that the state was not going to pursue action as long as we gave assurances that he was in proper treatment and that the problem was in check." Christian warned MacRae that the state would prosecute him if he did it again. The Diocese would not be able to give him a priestly assignment if the problem was not under control "since he would not be able to be entrusted with the care of souls." Christian questioned MacRae about his activity with a young man from Groveton and another from Florida. MacRae denied sexual activity with either. MacRae acknowledged both the legal and church response if he repeated his behavior. (B3044).

On December 27, 1983, Jeannette Gagnon filed a "Report of Child Sexual Abuse" with the Attorney General's Office. (B6732).[7] It indicates that that allegation was that, in the early summer of 1983, MacRae had Doe XII sit on his lap and kissed him. The report notes: "Founded Abuse: Rev. MacRae has admitted the incident to his superiors." The report lists as "Treatment/Outcome" that "Rev. MacRae is currently in active, regular therapy with Dr. Henry Guertin-Ouellette. Dr. Ouellette feels very confident that therapy is positive and that Rev. MacRae is now self-controlled enough to give some meaningful assurance that he is not likely to engage in deviant behavior." (B6733). Gagnon learned this information from Fr. Quinn. (B8886-87). There is absolutely no indication that the Division of Welfare conducted any independent investigation of this allegation. In fact, the Division of Welfare never spoke with MacRae about the allegations. (B8886; B10920). This was a departure from the norms of an investigation. (B8886). Judith Patterson, likewise, stated that no one from social services ever spoke with her about the incident. (B7692). No one from DCYS ever spoke with Doe XII's family about the allegations or the outcome of the investigation either.

MacRae wrote that in December 1983, "Fr. Frank Christian, the Chancellor, called me in to discuss the incident. It was felt that, since I had already resigned that parish on my own and was in counseling that no further action was necessary, but that he was waiting to hear from the attorney general's office whether it would be prosecuted. A few months later Frank told me it would not be prosecuted, but that any future such incidents would mean I could not be assigned in the Diocese." (B10530; B10929). MacRae was interviewed in prison on October 25, 2002. (B10916). He informed investigators that in December 1983, Christian "told [him] that [the DCYF complaint] had been investigated and was determined founded." (B10920; B10921; B10927). Despite these facts, Christian asserted in sworn interrogatories in 1993, in conjunction with civil law suits filed against the Diocese, that "[t]he Diocese was never informed by the Division of Children & Youth Services that they had a founded finding of child molestation against Gordon MacRae with respect to the minor victim [John Doe XII] from Hampton." (B3182).

Gagnon's report to the AGO was sent to Attorney Peter Foley on December 28, 1983, with a note that reads: "Due to the sensitive nature of the information and the individuals involved, we would appreciate it if every precaution could be taken to ensure that this information remains confidential." (B10489). On January 6, 1984, Deputy Attorney General

---

[7] This report has several obvious errors. It incorrectly reported John Doe XII's age was 15. In fact, he was 14 years old at the time of the report, and was only 13 years old at the time of the abuse. (B10632). The report even misspelled his name.

Peter Mosseau forward this report from DCYS on to Cheshire County Attorney Edward O'Brien. Mosseau stated: "I am sending this report to you for whatever further investigation and/or prosecution you believe is appropriate." (B10492).

On January 13, 1984, the County Attorney responded to Mosseau's letter. He acknowledged receipt of the report of child abuse. He stated:

> Ms. Jeannette Gagnon, Administrator of the Office of Social Services, Division of Welfare, called me today to discuss your letter.
>
> The incident occurred in Hampton, New Hampshire, Rockingham County, and subsequently, Father MacRae transferred to Keene. Ms. Gagnon informs me that she has been in touch with Rev. Quinn, Father MacRae's superior, and the incident has been admitted to by Father MacRae.
>
> Apparently, appropriate counselling and other actions are being taken to monitor Father MacRae and in the event that there are any other incidents of child sexual abuse reported, appropriate action would be taken and reports would be filed with this office and/or the appropriate County Attorney's office.
>
> Since this incident occurred in Rockingham County and not in Cheshire County and since Father MacRae is receiving counselling and is being strictly monitored, I do not plan to take any further action at this time unless I hear further from Ms. Gagnon or Rev. Quinn.

(B6731) (emphasis added).

Former Cheshire County Attorney O'Brien has no specific recollection of the complaint regarding MacRae or any communication he had with respect to the matter. (B7704). Jeannette Gagnon informed investigators that she spoke with O'Brien and conveyed to him that the matter had been resolved. (B8890). Gagnon recalls receiving assurances from Quinn that MacRae behavior would be monitored and supervised. (B8890). O'Brien's statements in the letter that the State was informed that MacRae was being closely monitored are also corroborated by Judith Patterson's understanding of the disposition of the allegations involving Doe XII. She was advised that MacRae would go into counseling and would not be permitted to have any further contact with children. (B7692). She understood that MacRae's job was going to be administrative only. (B7692).

On January 26, 1984, Jeanette Gagnon followed up on the MacRae matter by speaking with Quinn. (B6847). MacRae had been very close to a boy named John Doe XIII. In fact, Doe XIII had lived with MacRae for a period of time. (B10488). Gagnon expressed concern that MacRae continued to visit Doe XIII and buy him gifts. (B6847). Gagnon requested Quinn "to review this matter and to advise how the investigation will be conducted." (B6847). Quinn conveyed this information to Christian who spoke with MacRae. (B3045). Christian instructed MacRae to stop seeing Doe XIII and MacRae agreed. (B3045).

Task Force investigators interviewed Doe XIII. (B6276). Doe XIII was born in 1968. He met MacRae while MacRae was working as brother with the Capuchin Order in Groveton. (B6276). Doe XIII's parents divorced and MacRae assumed the father role in his life. At one point, Doe XIII was going to be sent to YDC for his behavior. MacRae agreed to take him in and Doe XIII lived with MacRae for a year in Hampton. (B6276). In fact, the Portsmouth District Court formally appointed MacRae as Doe XIII's guardian in 1982. Doe XIII denied that MacRae ever engaged in any inappropriate conduct with him. (B6276). He said that when the Diocese instructed MacRae that Doe XIII had to leave, MacRae found him a family to live with. After that, however, Doe XIII began to get in trouble again. (B6276). Doe XIII never saw MacRae abuse any children, but could not rule out that it happened. (B6276). MacRae often bought gifts for Doe XIII and Doe XIII viewed MacRae as his "hero." (B6277). He acknowledged, however, that MacRae told him many lies over the years. (B6276-77).

In 1985, MacRae wrote to Bishop Gendron and expressed his displeasure over problems he was having in his ministry in Keene. (B6729). MacRae acknowledged his problem with alcoholism and observed that it was particularly pronounced while he was in Hampton. (B6729). At that time, MacRae began to see Dr. Guertin-Ouellette and made physical, emotional, and spiritual progress with the therapist.

On March 28, 1986, John Doe XII reasserted the allegations he made in 1983 about MacRae's abuse of him. Doe XII disclosed to his high school psychologist that he had been molested by a priest and expressed concern that this priest might still be in contact with teenagers. This disclosure was reported to DCYS. Doe XII was interviewed by his school counselor and a DCYS case worker. During that interview, he disclosed that MacRae had hugged and kissed him on the mouth. He also described the "spider game." (B10497).

On March 31, 1986, DCYS referred the allegation to the Rockingham County Attorney's Office. (B10494). The Rockingham County Attorney, in turn, forwarded the matter to the Hampton Police Department for investigation. (B10496). The county attorney requested that the police conduct a joint law enforcement/social service investigation of Doe XII's allegations and requested the police file a final report with the county attorney's office. (B10496).

On April 18, 1986, DCYS social worker Marilyn Fraser reviewed the case with her supervisor, Geraldine O'Connor, another social worker, Elizabeth Davis, and Roger Desrosier, Administrator of DCYS. (B10503). Desrosier instructed the social workers to close the investigation. (B10503). On that day, O'Connor wrote to Davis that "Roger Desrosier, Administrator, at the State Office has ordered on April 18, 1986, an immediate halt on any investigatory activity relating to the [John Doe XII] sexual abuse report, which was received by the Portsmouth District Office on March 31, 1986." (B10504). On April 24, 1986, David Bundy, Director of DCYS reviewed the matter and concluded the 1986 allegations involved conduct that occurred in 1983. (B19597). Bundy expressed concern about why the matter was being investigated and suggested that O'Connor should have handled the matter in a way that "would have avoided the waste of valuable personnel time and probable confusion in the community." Id. Bundy concluded by stating: "In the future, when there is a sensitive case involving a prominent community member, religious or otherwise, I expect you to exercise good

136

judgment in assigning staff and conducting the investigation. Notify the Area Administrator if you are in doubt about which investigations should be assigned differently." Id.

On April 29, 1986, Marilyn Fraser wrote to Det. Wardle of the Hampton Police Department and informed him about the 1983 allegation by Doe XII. (B10506). She noted that at that time the matter was investigated, founded, and "[a] treatment plan was formulated and monitored."[8] Id. She concluded that DCYS was closing the investigation because "the recent report covers the 1983 allegations; no new or additional data was obtained." She also confirmed that based on this information, Hampton Police Department was going to close their investigation as well. Id.

On May 7, 1986, Marilyn Fraser met with Doe XII and his parents at their home in Hampton. (B10508). John Doe XII's parents informed Ms. Fraser that they never learned what the outcome of the 1983 allegation was. Judy Patterson had told them that it was "taken care of" in the church, but no one from the Diocese ever spoke with them. Ms. Fraser explained the outcome of the 1983 investigation. She told them "that the priest had admitted these difficulties, and further that a treatment plan had been developed and monitored." She noted that "[John Doe XII's parents] were relieved to hear this information." The family was still upset at the church for the way that they handled the matter. When Fraser stated during the meeting that the 1986 allegation did not raise any new issues, Doe XII corrected Fraser by noting that he had never previously disclosed the "spider game" and "made several suggestions that there was even more conduct that occurred." Based on this Ms. Fraser decided to "[f]ollow-up old record [sic] and any other available information from Father Quinn, the psychologist, Hampstead Hospital, [and] Catholic Charities to see if there are any clues of additional activity." (B10509).

On May 15, 1986, Fraser contacted Quinn regarding Doe XII's renewed allegations that MacRae abused him. (B10510). Quinn expressed concern that the family was never notified about what happened with MacRae. He offered to meet with them. Quinn informed Fraser that he had not received any written report on the results of MacRae's treatment with Dr. Guertin-Ouellette. Id. He informed Fraser, however, that he remembered monitoring the case and receiving a verbal report that the treatment was satisfactory. Id. Quinn indicated that there were no new reports regarding MacRae. He noted that "the Father has done 'remarkable work', not with youth, but in the field of drug/alcohol abuse. Father Macrae is still in the Keene parish." Id. (emphasis added). Fraser also checked with Det. Wardle, who interviewed Doe XII after the renewed allegations. Id. Det. Wardle told her that Doe XII did not disclose any masturbation, oral sex, or other sexual contact. Id.[9]

Ms. Fraser followed-up with Doe XII's therapist, Det. Wardle, and Fr. Quinn about the "spider game" or other sexual activity between Doe XII and Fr. MacRae. She was unable to confirm any additional information. The matter was closed on June 9, 1986, when Fraser wrote

---

[8] In reviewing the files, no treatment plan or monitoring was located, other than the Diocese's assurances to the civil authorities that MacRae was going to Dr. Guertin-Ouellette and that he would be strictly supervised.

[9] It is unclear why Det. Wardle told Fraser that Doe XII did not disclose any sexual contact. Det. Wardle's notes of his interview with Doe XII clearly indicate that MacRae engaged in the "spider game," which is described as "[h]is hand was spider – R leg – L leg then middle leg." Det. Wardle's notes do indicate that Doe XII disclosed hugging, kissing, and fondling in 1983. (B10525).

to John Doe XII's family.[10]  She reiterated the fact that a protective investigation was conducted in 1983. She noted that "[a] finding of sexual molestation was made. A treatment plan was developed and monitored for the perpetrator." (B10517). Fraser indicated that she was unable to discover any evidence of additional mistreatment but urged Doe XII or his therapist to contact Roger Desrosiers at the central office of DCYS if new information arose. (B10517).

On June 2, 1986, Fr. Quinn forwarded a letter to Ms. Fraser from Dr. Guertin-Ouellette regarding MacRae's therapy. Dr. Guertin-Ouellette wrote:

> I have been seeing Father MacRae weekly for more than three years. During that time, we have dealt with the incident that was reported from the East coast of New Hampshire. I feel that we have delved into this incident so as to bring about helpful insights that Father MacRae can use. Also, Father MacRae has seen fit to continue his visits here since that time to deal with matters that are not related to this incident in any way.
>
> As regard the query you made about the "spider game", it was never brought up in therapy. Also, when presented with this query, Father MacRae said he did not know what it could mean. Having dealt with Father MacRae for a long period of time I feel confident that he is telling the truth.
>
> I also feel confident in the growth that Father MacRae has exhibited and I feel that this matter has been dealt with and resolved on his part. I feel strongly that harm may come by the resurrection of this incident at this time.
>
> Father MacRae is aware of the re-emergence of this matter at this time. He has given me the proper release to communicate with you, or with any other appropriate person about the status of his progress at this time.

(B10545).

On June 3, 1986, Janet O'Connell from Catholic Charities reported to Marilyn Fraser the history of events between MacRae and Doe XII. (B3308). She indicated that in 1983, Doe XII disclosed fondling at that time.

In 1994, MacRae pled guilty to engaging in sexual conduct with Doe XII. (S-III at 153). The Cheshire County Superior Court made the following observations about MacRae's conduct toward Doe XII:

> I find clear and convincing evidence that [John Doe XII] was befriended by you, Mr. MacRae, while he was in his early teens and very vulnerable. He was having trouble in school and at home. You gained his confidence, encouraged a

---

[10] Det. Wardle indicates that the allegations against MacRae in 1983 were resolved when the Attorney General's Office approved a treatment plan for Gordon MacRae. (B6822; B8730). After the referral of the matter in January 1984 to the Cheshire County Attorney's Office, there is no evidence that the Attorney General's Office had further involvement in the investigation or resolution of the allegations against MacRae.

dependence and reverence for you, and then sexually assaulted him numerous times. When he attempted to confront you, you denied your acts. The psychological impact on [Doe XII] included a deep sense of betrayal, nightmares, suicidal impulses and eventual diagnosis of Post Traumatic Stress Disorder. Moreover, you destroyed [Doe XII's] dream of becoming a priest. . . .

(S-III at 156).

While MacRae did continue in counseling with Dr. Guertin-Ouellette for some time following the original report about the incident in 1983, there is absolutely no evidence that the Diocese restricted MacRae's ministry in any way as a result of the allegations involving Doe XII. In fact, MacRae continued to have contact with children after this. He abused three brothers before, during, and after this incident. He also abused other boys in the late 1980s, and was accused of abusing one boy at Spofford Hall, which is an adolescent drug and alcohol counseling center where MacRae was assigned and had been granted permission to celebrate mass.

### C.    MacRae's Sexual Assaults Of Jane Doe II's Children

During the summer of 1979, while MacRae was still in the seminary, he was assigned to work at Sacred Heart parish in Marlborough, New Hampshire. (B6748). Several of his evaluations from this assignment note that he was particularly adept at working with the youth in the parish. (B3269, B3272). It was during this time, that MacRae befriended Jane Doe II and her children. (B6808). In fact, on July 23, 1979, Jane Doe II wrote an evaluation of MacRae. (B3272). In that evaluation, she noted that MacRae is most effective in his ministry to youth. (B3273). In particular, she noted that MacRae had become very close to her 14 year-old son, who had feelings of unworthiness and insecurity. (B3273).

#### 1.    John Doe XIV[11]

John Doe XIV is the son of Jane Doe II and was born in 1965. Jane Doe II was a strict Roman Catholic and created a home where religion was a dominant factor in her family's life. Doe XIV believed that a priest "is someone who is the next thing to God, a messenger from God." The priest made moral judgments – decided what was right and what was wrong. Jane Doe II taught the children to do whatever they were told to do by priests.

During the summer of 1979, Doe XIV first met MacRae while MacRae was a seminarian. He was introduced to MacRae by Fr. Horan, the pastor at Sacred Heart. Doe XIV and MacRae became very close. MacRae was Doe XIV's best friend and Doe XIV called MacRae "Dad." The first physical contact occurred during a car ride to MacRae's parents in Massachusetts. MacRae instructed Doe XIV to sit closer to him and pulled Doe XIV toward him. He told Doe XIV that he wanted to bond. He put his hand on Doe XIV's leg and rubbed it.

Gordon MacRae was ordained on June 5, 1982, and assigned to Our Lady of the Miraculous Medal Parish in Hampton on July 10, 1982. (B3120). On June 15, 1983, MacRae

---

[11] Except as otherwise noted, the recitation of events in this section was taken from the factual findings in the court order on the statute of limitations in the civil lawsuit.  (B6880-85).

139

was assigned by the Diocese of Manchester to St. Bernard's parish in Keene. (B3030, B3120). John Doe XIV maintained close contact with MacRae at each of these assignments. MacRae began taking Doe XIV over to the rectory at St. Bernard's in Keene. (B6882). MacRae began giving alcohol to Doe XIV, who would feel, "fuzzy," "blurry," and "strange." Drinking became a regular part of the activity at the rectory. Doe XIV began spending the night at the rectory with MacRae. During these overnight visits, MacRae would massage Doe XIV's back, legs, and buttocks. He would then have Doe XIV roll over and MacRae would massage Doe XIV's chest and genitals. MacRae called this the "spider game." (B6882). MacRae would tell Doe XIV that these activities were "normal" and part of their bonding experience. (B6882). On some occasions, Doe XIV would drink so much he would pass out. (B6883).

Doe XIV described how, on one occasion in 1981 or 1982, MacRae brought him to the rectory in Hudson. Doe XIV guzzled some alcohol. MacRae then brought Doe XIV into the bedroom and made Doe XIV undress. He told Doe XIV he would no longer be his friend if he did not do it. According to Doe XIV, MacRae then left the room and another man, whom Doe XIV believed was a priest, came into the room and anally raped Doe XIV. A second man came in and had anal intercourse with Doe XIV as well. MacRae then came back and took Doe XIV to dinner and a movie. They never talked about the incident.

During MacRae's ordination in May 1982, Jane Doe II and her family were seated in the VIP section of the church. Doe XIV graduated high school in 1983 and entered the Army. During this time, he maintained contact with MacRae. Doe XIV was discharged from the Army in 1987 and decided to return to New Hampshire in 1988. When Doe XIV returned to New Hampshire he moved in with MacRae. He told MacRae that he needed some money. MacRae told Doe XIV he could earn a couple of hundred dollars by just laying there. Doe XIV understood this to be a sexual proposition. Shortly thereafter he moved out of MacRae's residence. Thereafter, he was contacted by Keene Det. James McLaughlin. He told McLaughlin about the solicitation, but did not report the other sexual contact at that time. (B6884).

In early 1989, Jane Doe II learned that there had been a problem with MacRae and a boy at Spofford Hall. She was advised to speak with her sons about their contact with MacRae. She did so and learned that they had been abused by MacRae. (B6884).

While MacRae was not charged with his sexual misconduct toward Doe XIV, in 1994, during MacRae's sentencing hearing, the court found clear and convincing evidence that MacRae had sexually assault Doe XIV many times. (S-III at 154). The court also found that "[t]he evidence of your taking [John Doe XIV] to Hudson for sexual gratification of two of your associates is clear and convincing. The evidence of your suggestion that [John Doe XIV] prostitute himself is clear and convincing." (S-III at 156).

## 2.    *John Doe XV*[12]

John Doe XV was born in 1969. He had the same religious experience in his upbringing as his brother Doe XIV. He met MacRae in 1979 when he was 10 years old. MacRae became very close to the family.

Over the next several years, Doe XV became very close to MacRae and developed trust in him. MacRae would often buy him gifts, including sneakers, clothes, a Walkman, and tapes. In 1982, he attended MacRae's ordination with the rest of his family.

When his parents separated in 1982, Doe XV suffered emotionally. MacRae provided support to Doe XV. The first abuse occurred in the spring or summer of 1982, when Doe XV was 13 years old. He and MacRae took a weekend trip to the rectory in Hampton. During the trip to the rectory, they discussed Doe XV's parents' divorce. When they arrived at the rectory, MacRae took Doe XV up to the living quarters, where there was a bar. MacRae began to serve alcohol to Doe XV, who became sick. Doe XV ended up on the bed in his underwear. MacRae touched Doe XV all over, including on his genitals. MacRae then performed fellatio on Doe XV. He also tried to have anal intercourse with Doe XV but Doe XV resisted.

After this episode, MacRae told Doe XV not to tell anyone. On the way home from the weekend, MacRae purchased Doe XV a Walkman and some tapes. When they finally arrived back at Doe XV's home, MacRae told Jane Doe II that he thought Doe XV's problems stemmed from his sexual identity and he told Jane Doe II that he though Doe XV was gay.

Following this incident, Doe XV continued to have contact with MacRae through the fall of 1985. MacRae brought Doe XV to rectories in Groveton, Rye, and Keene. The sexual contact continued, including masturbation and oral sex by MacRae on Doe XV. Doe XV estimates that there were 50 instances of sexual contact, at least 10 of which were oral sex.

The last instance of oral sex occurred in the fall of 1985 at the Keene rectory. MacRae served Doe XV mixed drinks. At one point, MacRae left the room, and someone else came in and performed oral sex on Doe XV.

In the fall of 1985, MacRae counseled Doe XV in preparation for confirmation. Doe XV received no spiritual guidance. Instead, MacRae solicited him to engage in prostitution. He told Doe XV that all he had to do was lie there. After Doe XV's confirmation, the sexual contact with MacRae ended.

In 1987, however, Doe XV was in MacRae's rectory office. MacRae had a gun and was joking around. He held the gun to his head and said that "if things got out, things would happen." Doe XV did not take MacRae seriously, but had not disclosed the abuse.

After he graduated from high school, Doe XV joined the Navy. He began to have personal problems and entered counseling. In 1989, he told the counselor that he had suicidal

---

[12] This recitation of events taken from the factual findings in the court order on the statute of limitations in the civil lawsuit.

thoughts and homicidal thoughts toward the person who sexually abused him. Doe XV was discharged from the Navy that year for medical reasons.

At some point in 1989, Jane Doe II asked her son if MacRae had ever done anything to him that would upset him. Doe XV "fell apart." Doe XV finally spoke with Keene Det. James McLaughlin in 1992 about his sexual contacts with MacRae.

In 1994, MacRae pled guilty to sexually assaulting Doe XV. (S-III at 153).

### 3.     John Doe XVI[13]

John Doe XVI was adopted by Jane Doe II when Doe XVI was one-year-old. He was born in 1967. He was raised in the same devout Catholic setting as his brother Doe XIV. As with his brother, he was raised on the belief that priests were representatives of God and were to be treated with reverence. Doe XVI was 11 years old when he first met MacRae in 1979. During that summer, Doe XVI was delivering newspapers with his brother. He delivered a paper to the rectory and was invited inside for something to eat. As Doe XVI was leaving, MacRae rubbed his body against Doe XVI's and fondled Doe XVI's genitals over the clothing.

After MacRae left Marlborough, he continued his contact with Doe XVI's family. In 1981, Doe XVI accompanied MacRae on the trip to the airport to drop Doe XVI's brother off. During the drive home, Doe XVI fell asleep. He awoke to find MacRae fondling his penis.

In 1982, MacRae visited Doe XVI's home. He then took Doe XVI for a ride to Keene to get some food. During the trip, MacRae fondled Doe XVI's genitals through his clothing.

As indicated above, in 1982, Doe XVI's parents separated. Doe XVI felt responsible for their separation and ultimate divorce. His abuse of alcohol, which had begun several years earlier, got significantly worse. At that time, MacRae, who lived in Hampton, continued to maintain contact with Doe XVI's family. Jane Doe II encouraged her children to spend time with MacRae because they needed a male role model in their lives.

In June 1983, MacRae was assigned to St. Bernard's parish in Keene. MacRae began visiting Doe XVI's family on a daily basis. Jane Doe II confided in MacRae her family's problems, including Doe XVI's substance abuse. MacRae, who had a degree in counseling and experience with alcohol abuse, offered to counsel Doe XVI. Jane Doe II encouraged Doe XVI to talk with MacRae. Doe XVI began seeing MacRae at the rectory to talk about his problems, although no formal sessions were scheduled.

On four separate occasions in the summer of 1983, during these counseling sessions, MacRae sexually assaulted Doe XVI. As Doe XVI explained his problems, MacRae would belittle or berate Doe XVI, who would break down and cry. MacRae then sought to comfort Doe XVI. During this time, MacRae performed an act of fellatio on Doe XVI.

---

[13] The facts with respect to this matter are taken from the State's brief on appeal from the conviction of MacRae.

During the same summer, MacRae also assaulted Doe XVI once during an overnight visit. Doe XVI had been sleeping in MacRae's living quarters in the rectory when he awoke to find his penis in MacRae's mouth.

The abuse continued through the summer of 1986, when Doe XVI was 19 years old.[14] Over this time, Doe XVI began to abuse drugs and his use of alcohol worsened. Doe XVI's relationship with his mother also worsened to the point that it was all but severed. MacRae was the main person in Doe XVI's life. During that summer, Doe XVI begged MacRae to get him help for his drug and alcohol problem. MacRae arranged for Doe XVI to go to Derby Lodge in Berlin for treatment. The night before Doe XVI was to leave for Derby Lodge he stayed in the rectory and MacRae again performed fellatio on him.

During his treatment at Derby Lodge, Doe XVI disclosed his sexual contact with MacRae for the first time. Doe XVI's counselor reacted with disbelief and told him that a priest could not do something like that.

When Doe XVI's treatment at Derby Lodge ended, he resumed his relationship with MacRae. Approximately six to nine months after Doe XVI revealed the abuse to his counselor at Derby Lodge, MacRae told Doe XVI that he was aware of the conversation and threatened to kill Doe XVI if he told anyone again.

Doe XVI's relationship with MacRae, and accordingly the abuse, ended in 1987, when Doe XVI was 20 years old. Doe XVI had been living at that point in an apartment in Manchester. His roommate committed suicide and he could no longer afford the apartment. MacRae, who was at that point on a leave of absence from the priesthood, agreed to allow Doe XVI to live with him in Keene. One day, Doe XVI found some videotapes in the apartment. They showed a young man lying naked on the bed. Doe XVI thought he recognized the young man as John Doe XVIII and he heard MacRae's voice on the videotape. Doe XVI got scared and took all of the videotapes and video camera equipment and brought the items to his mother's house. Once Doe XVI deposited the items in storage at his mother's house, he took off on his bicycle. MacRae intercepted him and demanded his stuff back. MacRae told Doe XVI he wanted to kill him and threatened him with a gun. Doe XVI eventually got away from MacRae.

Following this encounter, Doe XVI moved to Maine and then California. In 1989 or 1990, while Doe XVI was in California his mother asked him whether MacRae had ever done anything to him. Doe XVI avoided the question. Eventually, Doe XVI learned that MacRae had also abused his brothers. At that point he came forward. In 1994, MacRae was convicted by the Cheshire County jury based on his sexual abuse of Doe XVI.

### D.    MacRae's Sexual Misconduct With John Doe XVII

John Doe XVII first met MacRae in December 1985 through St. Bernard's parish in Keene when Doe XVII was 15 years old. (S-II at 13-14). Doe XVII was learning-disabled and was very disruptive in school. (S-II at 13). Doe XVII's mother was working for a Catholic school when she heard good things about MacRae's work with children. (S-II at 13). She set up

---

[14] These facts are drawn from the court order on the statute of limitations in the civil lawsuit.

a meeting for her son to enter counseling with MacRae. (S-II at 13). Doe XVII and MacRae became "fast friends" and spent "night and day together." (S-II at 14). Doe XVII and MacRae spent a significant amount of time together in the rectory over a six month period of time. (S-II at 5). On one occasion, MacRae and Doe XVII were together and MacRae asked to play a game called the "road map game." (S-II at 6-7). MacRae went down the buttons of Doe XVII's shirt with his fingers. (S-II at 7). Doe XVII did not understand what MacRae was doing, but he "had so much trust in him" that he did not think anything was wrong. (S-II at 7). As MacRae worked his way down Doe XVII's shirt he started to got beneath the boy's belt line on his pants. (S-II at 7). Doe XVII jumped up in a panic and ran out of the parish. (S-II at 7). He told his mother what had happened, but made her promise never to tell anyone. (S-II at 10). When Doe XVII's mother took him back to the rectory to confront MacRae, MacRae denied the conduct. (S-II at 10).

### E.    MacRae's Sexual Misconduct with John Doe XVIII

John Doe XVIII first met MacRae in 1983 when he was 12 years old. (B8864). During the spring of 1987, when Doe XVIII was 15 years old, MacRae engaged in sexual misconduct with Doe XVIII. Id. MacRae masturbated Doe XVIII on five or six occasions. Id. MacRae also played a game that he called the "robot game." Id. Doe XVIII would give instructions to MacRae who would act like a robot while his hand was on Doe XVIII's penis. Id. On one occasion, MacRae performed oral sex on Doe XVIII. Id. All of the sexual activity took place on the third floor of the rectory at St. Bernard's in Keene. Id. The sexual activity ended when Doe XVIII stole MacRae's check book in order to buy a gun to kill MacRae. Id. At that point, MacRae knew that Doe XVIII was serious about the fact that Doe XVIII wanted the abuse to stop. (B8860).

As described above, John Doe XVI recognized Doe XVIII engaging in sexual activity on a videotape that Doe XVI saw in MacRae's apartment. (S-II at 34). Doe XVIII was not aware that MacRae was videotaping their activity, but recognized that it was possible that MacRae had done so surreptitiously. (B8860). In 1994, MacRae pled guilty to engaging in sexual activity with Doe XVIII. (S-III at 153).

### F.    MacRae's Sexual Misconduct with John Doe XIX

In June 1987, MacRae requested a temporary leave of absence from his parish ministry from Bishop Gendron. (B3053). MacRae requested the leave of absence so that he could pursue a job as the Executive Director for Monadnock Region Substance Abuse Service, a drug and alcohol rehabilitation agency. (B3052; B3056). On June 15, 1987, Bishop Gendron granted MacRae a one-year leave of absence from priestly ministry with the Diocese. (B3057). Bishop Gendron urged MacRae to continue his counseling with Dr. Guertin-Ouellette. Id. He also stated: "You understand that with the exception of specific instances for which I would grant you faculties at your request, you would not have the faculties to function as a priest during the period of this year." Id.

On August 18, 1987, Bishop Gendron granted MacRae permission to celebrate Mass for patients at Spofford Hall. (B3127). Spofford Hall was a drug and alcohol counseling facility

144

located in Chesterfield, where MacRae was working as a counselor. (B7635; B7638). Gendron granted MacRae permission to perform mass at Spofford Hall "because of the manifest spiritual needs which you have so clearly described, as existing among the patients at the hospital." (B3127). Rev. Leonard Zecchini, the Director of Pastoral Care at Spofford Hall, also wrote to the bishop. "He, too, has very well described the unusual circumstances of the hospital and the ongoing need the Catholic patients have for regular spiritual care in their total recovery process." Id. Bishop Gendron noted: "I know that, in addition to your other talents and responsibilities, your priestly ministry in this regard will be of great assistance to the patients at the hospital." The bishop specifically warns MacRae of the "need to avoid public confusion about your present leave of absence from the Diocese and about your ministry as a priest in these rather particular circumstances. I know that you will take the necessary precautions in this regard." Id.

On March 11, 1988, MacRae wrote to Msgr. John Quinn to update him on his drug and alcohol counseling work. (B6852). MacRae noted that, with Bishop Gendron's permission, he had been providing pastoral care at Spofford Hall on a weekly basis and was performing mass at that facility once a week. (B6853). He noted that he was also providing penitential services and spiritual direction for individual patients. (B6853). MacRae also included a description of his duties with Monadnock Region Substance Abuse Service. (B6854). This description noted that the organization provided services to "children of alcoholic parents" and community education for various organizations, including schools. Id. In fact, MacRae was engaged in one-on-one counseling with adolescents who were substance-abuse dependent. (B7705-06). MacRae would also see adolescent clients out of the clinic in violation of Monadnock's policy. (B7706).

On March 23, 1988, Bishop Gendron granted MacRae an additional year leave of absence. (B6850). Bishop Gendron stated: "As we discussed, I would be most anxious to have you return to ministry at the end of this period of time." Id. He also confirmed that MacRae continued to have priestly faculties to celebrate mass at Spofford Hall. Id.

The Diocese did not warn the staff at Monadnock Region Substance Abuse Services, Spofford Hall, or the other priests or parishioners at St. Bernard's parish in Keene about MacRae's admitted sexual misconduct with Doe XII in 1983. (B3129). According to the president of Monadnock, the clinic did not do a background check on MacRae when he was hired because of his vocation as a Catholic priest. (B7705). The clinic relied on the fact that MacRae appeared to be a priest in good standing with the Diocese. (B7705). They received no information to the contrary from the Diocese. (B7705). Had the clinic been aware that MacRae had abused a boy in the past, they would not have hired him. (B7705-07). MacRae was fired by Monadnock when new sexual abuse allegations surfaced in 1988.

On July 14, 1988, New Hampshire State Police received a report of sexual abuse against MacRae. (B7638). John Doe XIX, a 17-year-old patient at Spofford Hall, alleged that he had requested to see MacRae after the celebration of Mass for the purpose of counseling. (B3046).[15] Doe XIX alleged that MacRae attempted to touch him sexually during this time. (B3046). The Director of Spofford Hall informed Msgr. Christian that it was possible that Doe XIX was lying about the incident and it would be difficult to learn the truth. (B3046). Doe XIX refused to be

---

[15] In a memorandum to the file, Msgr. Francis Christian reported that Doe XIX's age was 18 or 19 at the time of the incident. (B3046) This is incorrect. Doe XIX was only 17 years old. (B7638).

interviewed by state police in 1988 or by Task Force investigators in connection with the present investigation.

When MacRae was confronted about the accusations by state police, he related the following story: Doe XIX approached MacRae after mass one day at Spofford Hall to request that MacRae take Doe XIX's confession. (B7640). Initially, MacRae resisted because the policy required that a meeting be scheduled ahead of time. Id. When Doe XIX insisted, MacRae entered a private office with Doe XIX. (B7641). Following a discussion, Doe XIX grabbed MacRae from behind and then began to masturbate himself. Id. According to MacRae, when he tried to leave he heard voices in the hall and was concerned about how it would look. Id. MacRae said that the encounter lasted 60 seconds and when it ended, he did not inform any of the staff at Spofford Hall about the incident. Id.

On July 14, 1988, Auxiliary Bishop Gerry wrote to MacRae to inform him that any priestly faculties he had been granted were suspended as a result of the incident at Spofford Hall. (B3059). Bishop Gerry wrote: "You have read enough, I know, to realize that the decision to suspend you from faculties in no way is meant to be judgmental on the 'incident,' but to safeguard the Church so that she cannot be accused of knowing and still letting the priest operate under her auspices when he could be taking advantage of adolescents." Id. (emphasis in original).

## G.    MacRae's Sexual Misconduct With John Doe XX

Just two months after the allegations at Spofford Hall, MacRae was again accused of soliciting a minor to engage in sexual activity. John Doe XX first met MacRae when he was 9 years old at St. Bernard's parish in Keene. (B6956). MacRae was Doe XX's favorite priest in the parish and they became close friends. (B6956). Doe XX viewed MacRae as the father he never had. (B6956).

During 1988, while Doe XX was 14 years old, he spent a lot of time alone with MacRae. (B6956). MacRae would often steer the conversation toward sex. He would tell Doe XX that there is plenty of money if he only knew how to earn it. MacRae told Doe XX about a male friend who earned $600 an hour acting as a male prostitute. MacRae would also ask Doe XX how he felt about cuddling and touching someone of the same sex in bed. Doe XX told MacRae he though homosexuality was sick. MacRae would end the conversation by saying: "I'm just letting you know." (B6956).

One Sunday in October 1988, Doe XX confided in MacRae that he needed money for a school dance. MacRae had often given Doe XX money and gifts in the past. MacRae again steered the conversation toward sex. He asked Doe XX if he would pose for pictures. MacRae then took Doe XX back to his apartment. He took a camera out and instructed Doe XX to undress. MacRae then took pictures of Doe XX in various poses, including holding his genitals. When MacRae ran out of film, he gave Doe XX $20 and some change. (6956).

Later that week, Doe XX saw MacRae again. This time he asked him for $10. (B6956-57). MacRae asked Doe XX to pose for more pictures. They went to MacRae's apartment

146

again. This time, MacRae asked Doe XX to give himself an erection. When MacRae ran out of film, he gave Doe XX $50. (B6957).

The following weekend, MacRae and Doe XX were riding around in the car. Doe XX asked for more money. MacRae again took Doe XX to his apartment and took pictures of him. This time MacRae instructed Doe XX to ejaculate, which he did. When MacRae ran out of film, he took Doe XX home again. (B6957).

Doe XX's sexual contact with MacRae ended when Keene Det. James McLaughlin called Doe XX into his office for an interview, and Doe XX revealed what had happened to him. (B6986). Initially, Doe XX only disclosed the conversation with MacRae about prostitution. (B8724-25). At that time, Doe XX denied that any physical sexual contact occurred between himself and MacRae. (B8726).

Det. McLaughlin interviewed MacRae regarding his contact with Doe XX. MacRae admitted to soliciting Doe XX for sex. (B8759; B8763).    Following MacRae's admissions, on November 18, 1988, MacRae pled guilty to one misdemeanor count of endangering the welfare of a minor for soliciting Doe XX to engage in sexual contact. (B6995).

## IV.    MACRAE'S PSYCHOLOGICAL EVALUATIONS

As noted above, in the early 1980s, MacRae was involved in psychological counseling with Dr. Guertin-Ouellette, the therapist retained by the Diocese to counsel priests and other religious personnel. When Doe XII's allegations surfaced in 1983, the Diocese informed State officials that "Rev. MacRae is currently in active, regular therapy with Dr. Henry Guertin-Ouellette. Dr. Ouellette feels very confident that therapy is positive and that Rev. MacRae is now self-controlled enough to give some meaningful assurance that he is not likely to engage in deviant behavior." (B6733). When Doe XII's accusations resurfaced in 1986, Dr. Guertin-Ouellette again issued an assurance that MacRae had adequately dealt with his sexual problems. (B10545).

Following MacRae's conviction for endangering the welfare of a minor in 1988 with Doe XX, he was sent for psychological evaluation. MacRae was first evaluated by the House of Affirmation in Massachusetts in December 1988. (B3063). Despite Dr. Guertin-Ouellette's earlier assurances that MacRae's behavior had been adequately treated, the House of Affirmation issued a blunt report about MacRae's inability to control his sexual behavior:

> Father MacRae reported several inappropriate sexual encounters with adolescents. Although he experiences intense shame and guilt for the behavior, he indicated that he does not feel in control of such behavior. Father MacRae is in the early stages of understanding and arresting the inappropriate sexual encounters with minors. Although alarmed by it and very frightened of legal and personal consequences, he has little awareness of the impact of the behavior upon the adolescents, and he has little confidence that he can cease such involvements. He still tends to transfer some responsibility for the behavior to the adolescents and has difficulty acknowledging the sexually addictive nature of the behavior. These

147

factors indicate that Father MacRae is a sexual offender who currently is not able to curtail such behavior without professional support. We recommend that he receive professional support immediately.

(B3068).

MacRae received further psychological evaluation from Strafford Guidance Center in January 1989. Despite Dr. Guertin-Ouellette's earlier assurances, Strafford Guidance issued a scathing report about MacRae's sexual problems:

> The above data are indicative of severe and deep-seated psychopathology that has had many ramifications in his recent past and in his present psychological condition. The data indicate a severe personality disorder with related serious psychosexual and substance abuse problems. He has tremendous difficulty in intimate relationships, sexual or otherwise, and in fact tends to sexualize most relationships in one form or another. While he longs for sexual and emotional intimacy with others, he appears to be almost completely incapable of establishing and maintaining such intimacy in any real way. As a result, he has an extremely active and involved fantasy life, which I suspect is driven by only semi-repressed sado-masochistic drives. . . .

> I strongly recommend long-term intensive psychotherapy. He fits the profile of what is known in the literature as a "fixated" sexual offender. For this reason, he may not be appropriate for the SATP of the Strafford Guidance Center, which is not geared specifically to deal with sexual offenders of this type. He is in clear need for insight-oriented psychotherapy to address the psychodynamics as outlined above, as well as a program specifically geared to deal with fixated sexual offenders. . . .

(B6746-47).

A second therapist at Strafford Guidance reached similar conclusions in February 1989:

> Mr. MacRae appears to fit the description of a fixated sexual offender, a man who has a primary sexual interest in children, usually males, though with the possibility of attraction to and sexual activity with adults; who identifies with his child victims and who relates to children as peers, scaling his behavior to the child's level or acting in a "pseudo-parental role." Other characteristics of fixated offenders which apply to Mr. MacRae are the lack of a precipitating stressor, the compulsive quality of the behavior, and a pervading characterological immaturity.

> . . .

> As fixated offenders do not respond to outpatient treatment and have the best record of recovery when treated in an inpatient setting, initially in a program specifically tailored to sexual offenders, it is important that Mr. MacRae undergo

148

treatment in such a modality. It is important that Mr. MacRae not be deferred to
as special in treatment because he is a priest.

. . .

It is of great importance that Mr. MacRae not be allowed to place himself in a
position of authority over minors in the future, and that he continue to take
responsibility for this and for other potentially dangerous behaviors.

(B6738-39).

     Based on the evaluation from Strafford Guidance, MacRae attended in-patient therapy
with the Servants of the Paraclete in Jemez Springs, New Mexico. (B6739). MacRae began
treatment with the Servants of the Paraclete on March 14, 1989, and was a resident with the
facility for slightly more than one year. (B3090; B3347). On April 15, 1989, Bishop Gendron
wrote to Dr. Peter Lechner, Director of Villa Louis Martin ("VLM"), the residential treatment
center run by the Servants of the Paraclete. In that letter, Bishop Gendron thanked Dr. Lechner
for the progress report on MacRae. (B6725). Bishop Gendron then wrote: "I will, as you
request, destroy the various psychological reports you included." (B6725). While there are no
progress reports in Diocesan files on MacRae from VLM prior to April 15, 1989, the Diocese did
retain subsequent psychological reports from VLM on MacRae.

     Dr. Lechner indicated that the only misconduct that VLM was aware of with respect to
MacRae was the following: "Gordon was referred to us as a 'sexual offender' who needed
professional treatment. During the course of the treatment it because evident that his sexual
offenses consisted in limited sexual activity with adults before ordination, some sexual activity
with adult prostitutes after ordination (for the Villa Louis Martin program this was regarded as a
moral offense and unacceptable behavior for a priest), as well as having a young man sit on his
lap, hugging him and attempting to kiss him (Gordon had been drinking alcohol at the time), and
in imprudent conversation with a young man who said he would do anything for money. We
were aware of no other sexual offenses." (B3348). Dr. Lechner did not view MacRae as a
sexual offender in the sense of "someone who repeatedly sexual[ly] abused others in an illegal
fashion and was likely to continue doing so without professional help . . . ." (B3349). Dr.
Lechner disagreed with the conclusions reached by the House of Affirmation and Strafford
Guidance Clinic. Specifically, he stated:

     When Gordon first came to us, his presence was preceded by reports from House
of Affirmation and Strafford Guidance Clinic. The House of Affirmation report
was written after Gordon was there for five days and the Strafford Guidance
Clinic report was written, according to their report, after two hours of
interviewing – lengths of time that would not seem adequate to accurately
evaluate the complex problems Gordon suffered from. These reports were very
condemnatory of Gordon and pictured him as a child offender with little
conscience. It was only after time that it became clear that Gordon did not fit the
description of the House of Affirmation and Strafford Guidance Clinic. He had a
depth of conscientiousness and sensitivity to others, and a very high degree of

ethical concern that did not fit with what the reports said of him. These conclusions were more consonant with the conclusions of Dr. Guertin-Ouellette who had seen Gordon in psychotherapy for a period of four years.

(B3355).

In September 1990, after completion of his residential treatment at VLM, MacRae was offered a job by the Servants of the Paraclete to be the assistant director of the Foundation House, a sister program to VLM. (B3107; B3109). Bishop O'Neil granted MacRae permission to accept the position with the Servants of the Paraclete. (B3110).

The Servants of the Paraclete continued to support MacRae even after his arrest, conviction, and sentencing. In fact, on November 30 2001, Dr. Peter Lechner, one of the counselors who evaluated MacRae at Villa Louis Martin, wrote to Bishop John McCormack to offer assistance to MacRae in his legal fight against his convictions and sentences. (B6866). Dr. Lechner acknowledged receiving correspondence from Bishop McCormack regarding the fact that the Diocese was considering a lawyer to check into MacRae's sentencing. Dr. Lechner stated: "I would like to offer any help possible, and would be happy to send the brief I wrote several years ago in his regard." Id. Dr. Lechner also noted that the General Council of the Servants of the Paraclete "recommended that I contact you and suggested the possibility of a small fund being started to help finance legal work for Gordon. We would be willing to contribute a few thousand dollars if this would help." Id.

V.    MACRAE'S CRIMINAL TRIAL AND SENTENCING

In 1994, following a lengthy criminal trial, MacRae was convicted of engaging in various acts of sexual assault with John Doe XVI. MacRae also pled guilty to sexual assaults involving John Doe XII, John Doe XV, and John Doe XVIII. Judge Arthur Brennan held a three-day sentencing hearing in November 1994. During the hearing, Judge Brennan heard from multiple witnesses, including the victims, their family members, and expert witnesses. MacRae also called witnesses, including Father David Deibel, a Catholic priest, canon lawyer, and consultant for the Servants of the Paraclete. (S-I at 102). Deibel met MacRae in 1992, while MacRae was working for the Servants of the Paraclete. (S-I at 110). Fr. Deibel testified that he felt MacRae's rehabilitation was well underway and that prolonged incarceration would be counterproductive. (S-I at 122).

After hearing the testimony of all of the witnesses, Judge Brennan made the following comments in support of the sentence he imposed on Gordon MacRae:

I've listened to the evidence presented at the sentencing hearing and used my own education and experience and the constitutional and legal standards for sentencing to render an appropriate sentence for the convictions against Gordon MacRae resulting from his assaults on [John Doe XVI]. I want to thank the witnesses who testified at this hearing, both for and against Gordon MacRae. I found, with the exception of Father David Deibel, the priest and lawyer, that you all spoke in good faith, whether I agreed with what you said or not. I believe that Father

150

Deibel attempted to mislead the Court, that he intentionally minimized the behavior of Gordon MacRae, and that he is not a credible witness. I hope and trust he is not representative of the attitudes of the governing body of the Catholic church concerning sexual predators within its clergy.

Recently I read some words about the lack of heroes in this generation. They were written by a college student who was nearly the same age as the young men we have called victims in this case. And while I understand what the writer means, I disagree, and instead believe that heroes are with us every day. We need only open our eyes. Heroes include the woman who throws off the cloak of a battering partner, the trooper who gives the life he risked so many times, the people who overcome their own physical and mental disabilities or those of their family, the victims who find the courage to face this awkward and admittedly intimidating legal system. Heroes are people who are thrown into a journey of danger, injury, pain, or humiliation. Sometimes they are killed or destroyed; but whether they live or they die, whether they succeed or fail, they present us with an important message about what we can be and about what we should do.

Courtroom One in Cheshire County has some of those heroes here today. May the rest of us understand their message and may they heal and wear their scars proudly.

. . . .

I presided over your trial, Mr. MacRae. The jury was fair and impartial. Attorneys Koch, Davis, Reynolds, and Gainor performed aggressively, competently and honorably. Later, I took your pleas of guilty to the sexual assaults of [John Doe XV, John Doe XII, and John Doe XVIII]. They, too, were young teen-age boys when you assaulted them. You admitted that you committed those acts and you intended to commit them. . . .

I heard the convincing evidence from [Doe XV, Doe XIV, and Doe XVI] of the many times you sexually assaulted each of them when they were boys. You cloaked yourself in the authority of the Catholic Church and deceived their mother into putting her sons in your trust. You befriended each of them. You gave them things she could not. Movies, trips, money, your undivided attention. Surrounded by the aura of the Catholic Church, and all that it meant to this family, you gave them time in your rooms at the rectory, a place filled with a certain sense of knowledge, strength, and institutional sanctity, particularly for these young and vulnerable teen-age boys who revered priests. You infiltrated their home, constantly increasing their dependence upon you and your authority over them. And when they were away from home with you, you made certain they were alone. You encouraged and accepted their confidence and you used your education and your sophistication to bind these boys to you. Then you raped them again and again and over and over. And they could not tell anyone. They did not tell each other. They carried the guilt of your sexual assaults and they

each carried that terrible weight alone. And with each assault, you violated a sacred trust of their mother, whom you continuously deceived as you undermined her family and ultimately her faith.

It goes without saying that you scorned the most fundamental teachings of the religion you stood for. Your acts against those children, now young men, is a nightmare to decent people. The evidence of your possession of child pornography is clear and convincing. The evidence of your taking [John Doe XIV] to Hudson for the sexual gratification of two of your associates is clear and convincing. The evidence of your suggestion that [John Doe XIV] prostitute himself is clear and convincing. The evidence that you told [John Doe XVI] that no one would ever believe him is clear and convincing. [John Doe XII] – I find clear and convincing evidence that [John Doe XII] was befriended by you, Mr. MacRae, while he was in his early teens and very vulnerable. He was having trouble in school and at home. You gained his confidence, encouraged a dependence and reverence for you, and then sexually assaulted him numerous times. When he attempted to confront you, you denied your acts. The psychological impact on [Doe XII] included a sense of betrayal, nightmares, suicidal impulses and eventual diagnosis of Post Traumatic Stress Disorder. Moreover, you destroyed [Doe XII]'s dream of becoming a priest. . . .

[John Doe XVII]. I find by clear and convincing evidence that when [John Doe XVII] was 15 years old, his mother referred him to you for counseling because she had heard of your work with troubled boys. Once again, you gained a mother's confidence. You then exploited the vulnerability of the boy and his family. When you attempted to sexually assault him, [John Doe XVII] resisted and confided in his mother. [Doe XVII] pleaded that she never tell; and, understandably, she did not. It was not until he ran away from you in desperation searching for her son and confronted you. You denied everything, and instead you made counter-accusations that have become the trademark of your struggle against justice.

. . . .

. . . I conclude that you, Mr. MacRae, remain an extremely dangerous and high risk sexual offender. The compulsiveness and repetitiveness of your sexual assault against young boys, documented from 1979 to 1988, the selection and grooming of vulnerable boys and families, the deceitful use of both the authority of a Catholic priest and the corresponding spiritual power that the religion represents, the evidence of your solicitation and prostitution of young men for the gratification of yourself and others of your ilk, the evidence of child pornography and multiple victims, your complete lack of remorse, your aggressive denial of wrongdoing, your merciless attack on the character of the victims who confronted you, the ruthless application of your intelligence, education and experience as a counselor to undermine these children and their families and your total lack of compassion for your victims and the friends you continued to mislead, I

considered all of these things in deciding your sentence for the attacks on [John Doe XVI]. And I find that the prospects for your rehabilitation are very poor. There is no credible evidence that you have responded to the treatment that you have received. Throughout these proceedings, I have listened to your witnesses and I have watched you closely. I detect nothing in you at this time that gives me a reasonable basis for releasing you into the community ever. I hope that in the years to come effective treatment will be developed and that you will embrace it. Perhaps you will someday understand the depth and damage of your acts and perhaps we will someday develop the technology to allow you to be released into society and at the same time ensure the safety of the children and families that you prey upon. But I am not persuaded that we have the knowledge or technology today and I will not put this community's children at risk for your benefit.

(S-III at 151-59).


## VI.   DIOCESAN RESPONSE TO MACRAE'S CONVICTIONS AND SENTENCES

In 1998, MacRae wrote to the Vatican to complain about the way he felt that the Diocese had treated him during the criminal trial. (B3401). In February 1999, after receiving information from Diocesan officials who were familiar with MacRae's case, Bishop McCormack responded to MacRae's complaints to the Vatican. Bishop McCormack related the following information to the Vatican. Beginning in the Fall of 1983 and until his conviction, several accusations were made by different young men against MacRae. All accusations involved different levels of sexual activity. Some more serious than others "but always they involved inappropriate sexual conduct." MacRae was required to attend increasing levels of counseling culminating in long-term in-patient care with the Servant of the Paraclete. During his leave of absence, "he was formally suspended from priestly ministry as a result of the public nature of one of these charges." McCormack noted that "[t]he extent of the guilt or innocence of Gordon MacRae is difficult to establish, even though the civil court found him guilty. He did admit to diocesan officials inappropriate caressing and kissing of a young man in at least one situation." Bishop McCormack then summarized the conflicting psychological evaluations discussed above. The Bishop went on to note that "[w]hatever the truth is about his guilt or innocence, the Diocese of Manchester was in a difficult situation during his public trial. The Diocese supported him privately with funds while at the same time not defending or supporting him in a public way. For example, the Diocese helped to fund his defense." Bishop McCormack concluded: "Some believe his prison sentence is unduly harsh and lengthy. This is due in part due [sic] to the way the law of New Hampshire is written, and also to the public sentiment about such crimes. There are people in prison who are serving much shorter sentences for very serious crimes. Furthermore, it is probable that at the time of his arrest and later conviction that he had his impulses under greater control and was not longer a serious threat to society. His lengthy jail sentence is even more inappropriate given his rehabilitation. I am sympathetic with Gordon MacRae's concerns in this regard, but do not feel that the Diocese can publicly advocate on his behalf without risking grave public misunderstanding about the seriousness of its understanding with regard to sexual misconduct by clergymen." (B3472-74).

153

On November 16, 1999, Bishop McCormack wrote a memo to the file regarding observations made by Auxiliary Bishop Christian about MacRae's conviction. (B3513). That memo concluded: "The sentencing in the [John Doe XVI] case was not proportionate to the sentencing in similar cases. He was convicted as a pedophile. The [John Doe] children possibly lied. Even though there may be some irregularities in the handling of his criminal trial because of the lying, based on the fact that he was criminally convicted, the Diocese did not think it could win a civil case or be able to defend, therefore, that they had supervised him appropriately and correctly." (B3513).

On November 14, 2001, Attorney Bradford Cook wrote to Bishop McCormack with his comments and observations on MacRae's continued challenges to his convictions and sentences. (B3515). Cook made the following observations to Bishop McCormack: "Throughout the process, it was obvious that all of [Jane Doe II's children] were expansive in their testimony and it was aimed at getting a certain result and frankly, none of the attorneys involved in the criminal or civil cases trusted their testimony to be completely accurate. Whether it was all trumped up or totally manufactured is impossible to know, but unlikely. That it was embellished was clear." (B3515). There is absolutely no indication on what Attorney Cook based these conclusions.

## VII.    SETTLEMENT OF CIVIL CLAIMS AGAINST THE DIOCESE

In 1997, the Diocese entered into civil settlements with John Doe XIV, John Doe XV, and John Doe XVI, after extensive civil litigation. (B3381; B3388; B3394). Each of the settlement agreements contained a confidentiality clause that prohibited the victims from disclosing the facts surrounding the abuse or the settlement itself. If the victims breached the confidentiality provisions they would forfeit the money paid to them by the Diocese. The settlement agreements did not provide any penalty if the Diocese disclosed information about the victims. Id.

## VIII.   CONCLUSION

While the facts detailed above would have supported a prosecution for endangering the welfare of a minor against the Diocese, such a prosecution likely would have been barred by the statute of limitations. Based on the civil law suits filed by the victims in the 1990s, it is clear that the victims knew that the Diocese breached a duty of care to them by failing to take effective steps to protect them from MacRae's sexual misconduct when the Diocese first learned of MacRae's misconduct in 1983. Because the victims were aware of the Diocesan response to MacRae's conduct more than one year before the present investigation, the State could not have relied on the discovery provision to toll the statute of limitations.

154



*"There is nothing so powerful as truth"*
DANIEL WEBSTER

# NEW HAMPSHI
# UNION

unionleader.com

Classified ......... B3-20
Comics/TV ......... D8-9
Crossword ......... D7
Editorials ......... A18
Entertainment ... C3-4

Notices ..A12, C5, D7
Obituaries ......... A6
Sports ......... D1-6
Weather ......... A4

**Letters**
▶ A19

## A Small Prayer

Thank You, Lord, for hearing every prayer. Amen

## Today's Chuckle

The sum of the parts can be greater than the whole ... like when you're trying to repack a suitcase.





**New Hampshire**
**Union Leader**
143rd Year
©2005
Union Leader Corp.
Manchester, N.H.

# Judge stands b

◆**Guilt or innocence:** Wall Street Journal a look into Gordon MacRae case.

**By DENIS PAISTE**
Union Leader Staff

**MANCHESTER** — Superior Court Judge Arthur Brennan yesterday stood by his sentencing of suspended priest Gordon MacRae, whose trial and imprisonment were the subject of a two-part essay in the Wall Street Journal this week.

"I did my best and impartial in and the jury mad sion, and I careful ered the argument sides at sentencing the decision to sent don MacRae to a s sentence based on ments I heard and siderations of sent

# LEADER

**MANCHESTER EDITION** ☆

**FRIDAY, APRIL 29, 2005**

60 Pages * 50 Cents

## priest's sex abuse sentence

es'

e fair
case,
deci-
nsid-
both
made
Gor-
antial
argu-
con-
g in

New Hampshire," Brennan said yesterday in a telephone interview from Sullivan County Superior Court.

MacRae received the maximum New Hampshire prison sentence in November 1994 of 33½ to 67 years for sexual assault on a male between 13 and 16 years old.

The sentencing followed a three-day hearing in which five victims described how MacRae befriended them as teenagers and then sexually

molested them. Only one alleged victim testified during the jury trial.

Wall Street Journal editorial board member Dorothy Rabinowitz's articles Wednesday and yesterday focused not only on the question of MacRae's guilt or innocence, but also on the system that allows anonymous accusers to receive financial settlements for

▶ See **MacRAE**, Page A17

### Inside:

▶ **Vatican:** Bishop John B. McCormack has sent 27 cases of priests credibly accused of abusing minors to the Congregation for the Doctrine of the Faith, Page A17

▶ **Manchester:** The diocese settled three new cases this year involving clients of Concord attorney Charles G. Douglas III, Page A17

# MacRAE

allegations of sexual abuse against priests.

By the end of 2004, Rabinowitz reported Wednesday, the Diocese of Manchester had paid $22,210,400 in settlements of claims against priests by accusers.

"I wanted to illustrate one of the driving forces of miscarriages of justice, and I think more and more people, it's not just me, have noticed that personal injury lawyers are driving many cases, and I don't think that's in dispute, that would not have been brought otherwise, and I think Father (Ed) Arsenault knows that," Rabinowitz said in a telephone interview yesterday.

The Rev. Arsenault is the bishop's delegate for ministerial conduct.



**BRENNAN**
in 1995

## Named in article

Yesterday, Peter E. Hutchins of the Manchester law firm Wiggin and Nourie took the Journal to task for naming one of his clients who reached a confidential financial settlement with the diocese for alleged abuse by MacRae.

"It came as a complete shock to both him and I to find out that his name had been disclosed twice in the Wall Street Journal, an international publication," Hutchins said.

"Because we originally filed our lawsuit against the diocese in April of 2002 and we filed it as a class action, it allowed these people to bring forward

 

**HUTCHINS**
a complete
shock

**MacRAE**
maximum
sentence

their claims but not have to go public with their names," Hutchins said in a telephone interview. "Many of them had not even told their wives, let alone their children or their co-workers.

"Confidentiality was of utmost concern, and I can tell you that it was factored into the settlement amounts, specifically, the settlement amounts were less than they might have been because of the diocese agreeing to allow our clients to maintain their anonymity," he said.

"That is why the particular breach of this confidentiality with regard to the client named in the Wall Street Journal article is so egregious," Hutchins said.

In an e-mail message yesterday afternoon, Hutchins said, "She did not take the time to speak with my client or I."

New Hampshire Union Leader policy is not to report the names of victims of sexual abuse.

Rabinowitz yesterday defended the Journal's naming of one of MacRae's accusers in the civil class-action lawsuit. "I'll tell you why because the cloak of anonymity is the worst encouragement for a false abuse climate; that is the problem," she said during an interview.

## McRae goes to trial

In yesterday's installment, "A Priest's Story — Part II," Rabinowitz, the 2001 Pulitzer Prize winner for commentary, wrote that, "There would be, in the end, just one trial — on accusations by Thomas Grover that the priest had assaulted him sexually during counseling sessions in a rectory office, and elsewhere."

A statement issued by the diocese shortly before MacRae's trial portrayed the church as a victim of MacRae's alleged actions. "This statement by his diocese, effectively declaring him guilty just as he was about to go to trial, shook him to the core," Rabinowitz wrote.

"If the events leading to Fr. MacRae's prosecution had all the makings of dark fiction, the trial itself perfectly reflected the realities confronting defendants in cases of this kind," the article continued.

Grover, she wrote, had a civil lawsuit in the works against the Diocese of Manchester contemporaneously with MacRae's trial on Grover's allegations against him. Yet, she wrote, Judge Brennan "refused to allow into evidence Thomas Grover's long juvenile history of theft, assault, forgery and drug offenses.

"In New Hampshire, where juries need only find the accuser *credible* in sex abuse cases, with no proofs required, this was no insignificant restriction," Rabinowitz wrote in the article on the Journal's Opinion page.

Among Grover's allegations, she reported, were that during the summer of 1983, at age 15,

—— Continued From Page A1

: had been assaulted sexually
' the priest in successive
ounseling sessions; that he
.d blackouts that caused him
go to each new counseling
ssion with no memory that he
.d been sodomized and other-
.se assaulted the session be-
.re; and that the priest had
.ased him with a car.

" 'And he had a gun,' the ac-
.ser told the court, " the Jour-
.l column continued, " 'and
: was threatening me and tell-
g me over and over that he
.uld hurt me, kill me, if I tried
tell anybody, that no one
.uld believe me.' "

In a telephone interview yes-
:day, Rabinowitz said she had
.ked MacRae many times if he
.s innocent and he repeatedly
.d he is innocent.

"I certainly think that the trial
d accusations like this that
fy the laws of time and space
d factually, let us not talk
out surmises, where the facts
the record are so stunning in
.eir defiance of rationality,
.it this is a case that cries out
: the suspicion, a very power-
. suspicion, that justice was
.t done, and this I will tell
.u, I expect a judge who was
.esiding over a court in a time
fear and sweeping rage over
.l abuse, I expect him not to
swept away and I expect him
uphold the statutes of ration-
ty and justice, which he did
.t do, which his sentence
.ows," she said.

.MacRae is a medium-security
.soner at the New Hampshire
.te Prison, where his four
.nsecutive 7½- to 15-year sen-
.ces will keep him behind
.rs until at least 2028, when he
.l be 75 years old. New

*"And if you suggest that I had any involvement in this case legally before, I will hold you to account because this is an utter lie and a cheap one."*

**DOROTHY RABINOWITZ**
Wall Street Journal editorial board

Hampshire Union Leader re-
quested an interview with Mac-
Rae through prison officials
Wednesday.

Yesterday, prison spokesman
Jeff Lyons said MacRae in-
formed officials he wanted to
wait until Monday to decide
whether to grant an interview
and he wanted to talk to his at-
torneys.

## A denial of involvement

Asked yesterday whether she
had previously written about
MacRae's case, Rabinowitz said
she had not. But she gave con-
flicting accounts of how her
name and that of an attorney
who specializes in appeals ap-
peared together in internal Di-
ocesan communications dating
to the fall of 2001, released as
part of the Diocese' March 2003
settlement with the state Attor-
ney General's Office over wide-
spread allegations of priestly
abuse.

"I haven't been involved in
this case," Rabinowitz said. "I
cannot help somebody using
my name. There was no litiga-
tion going on. They were dis-
cussing the possibilities of
getting an attorney, I knew this
attorney...this attorney did not
take the case."

"I read the documents and I
have the same documents that
you have," she said. "Gordon

MacRae is in prison, and I
hadn't even met him."

Later, in the same telephone
interview, Rabinowitz said,
"Robert Rosenthal was an attor-
ney who does very well in ap-
peals cases...and so when
asked for a name, I produced
that name."

Asked who had asked for the
name, she said, "Father Mac-
Rae, and I believe it was Father
Diebold, the canon advocate for
Father MacRae."

She continued, "And if you
suggest that I had any involve-
ment in this case legally before,
I will hold you to account be-
cause this is an utter lie and a
cheap one."

Bishop's delegate for ministe-
rial conduct Arsenault said yes-
terday, "Without looking at the
documents, what I can tell you
is Dorothy Rabinowitz was in-
troduced into Gordon's situa-
tion by Gordon.

"Her introduction to us was
by way of Gordon... I would
say as early as 2001," Arsenault
said. "I have not experienced
her to be objective; my experi-
ence of her is she approaches
Gordon's situation as an advo-
cate."

◆

**On the Net:**

http://doj.nh.gov/publications/re-
ports.html

http://online.wsj.com/public/us

**Family Care of Farmington**
316NH Route 11 Farmington, NH 03835
(603)755-9801 Fax: (603) 755-9806

*March 4, 2008*
Page 1
Chart Document

---

**BRETT G MCKENZIE**
**Male DOB: 04/21/1971**                    54404-0

Home: (603)817-0856 Office: (603)427-1553
Ins: BCBS HMO (753) Grp: 340005044

**01/11/2008 - Office Visit: med rev**
**Provider: Michael Calamia MD**
**Location of Care: Family Care of Farmington**

### History of Present Illness
**History from:** patient

**Chief Complaint:** Review and update of medical problems and medications. med rev
pt reports ongoing issues with fatigue. thinks he should go down on his methadone dosage. eventually would like to get off it completely. ongoing issues with depression. he and his son continue to have their issues. he feels like his son take out all of his anger and issues related to his mom on him. denies s.i.

**Current Medications**
ASPIRIN 81 MG TABS (ASPIRIN) qd
METHADONE HCL 40 MG TBDP (METHADONE HCL) 1 1/2 tabs by mouth daily
LIPITOR 20 MG TABS (ATORVASTATIN CALCIUM) 1 tab by mouth daily
WELLBUTRIN XL 300 MG TB24 (BUPROPION HCL) 1 tab by mouth daily
ALBUTEROL 90 MCG/ACT AERS (ALBUTEROL) 1 puff q 4-6 hrs prn
CLOBETASOL PROPIONATE 0.05 % CREA (CLOBETASOL PROPIONATE) apply to affected area bid
ADDERALL XR 10 MG CP24 (AMPHETAMINE-DEXTROAMPHETAMINE) 1 tab by mouth daily
CLOTRIMAZOLE 1 % EXT CREA (CLOTRIMAZOLE) apply to affected area bid
CELEXA 10 MG TABS (CITALOPRAM HYDROBROMIDE) 1 by mouth daily

**Current Allergies**

### Past, Family, and Social History
**Past History (reviewed - no changes required):**
surg hx:vasectomy
R./ metacarpl fx
B carpal tunnel release

**Social History (reviewed - no changes required):** currently lives with son  who has adhd
daughter from prior marriage who lives in dover
use of alcohol
smoker
works for town of portsmouth

### Risk Factors
**Tobacco use:** current
  **cigarettes:** 1.5 pack(s) per day **for** 20 years
    **Smoking pack-years:** 30
**Counseled to quit/cut down:** yes

### Readiness to Change

**Family Care of Farmington**
316NH Route 11  Farmington, NH 03835
(603)755-9801  Fax: (603) 755-9806

*March  4, 2008*
Page 2
Chart Document

---

**BRETT G MCKENZIE**
**Male  DOB: 04/21/1971**                    **54404-0**

Home: (603)817-0856 Office: (603)427-1553
**Ins: BCBS HMO (753) Grp: 340005044**

**1. Are you thinking about stopping tobacco use?** No
**2. Would you be interested in talking to the provider on ways?** No
...............................................Tabatha Irvine MA January 11, 2008 4:25 PM

## Review of Systems
**General:** Complains of see HPI.
**Psychiatric:** Complains of see HPI.

## VITAL SIGNS
**Entered weight:** 232 lb., 0 oz.
**Calculated Weight:** 232 lb.
**Pulse rate:** 105
**Pulse rhythm:** regular
**Respirations:** 16
**Vitals measured by:** Tabatha Irvine MA

## BLOOD PRESSURE
Standard
**Cuff Size:** large adult
**Blood Pressure:** 132/82 mm Hg  - taken by: Tabatha Irvine MA

**Allergy list reviewed during this update**

Medications reviewed.  No changes reported.
Tabatha Irvine MA,  January 11, 2008 4:25 PM
NKDA
...............................................Tabatha Irvine MA January 11, 2008 4:25 PM

## Physical Examination

**Constitutional:** Alert, no acute distress, well hydrated, well developed, well nourished.
**Eyes:** normal sclera and conjunctiva.
**Psych:** flat affect.

## Assessment
**Status of Existing Problems:**
Assessed History of  DEPRESSION as unchanged - Michael Calamia MD
Assessed History of  NARCOTIC ABUSE as unchanged - Michael Calamia MD

## Plan
**Updated Medication List:**
ASPIRIN 81 MG TABS (ASPIRIN) qd
METHADONE HCL 40 MG TBDP (METHADONE HCL) 1 1/2 tabs by mouth daily
LIPITOR 20 MG TABS (ATORVASTATIN CALCIUM) 1 tab by mouth daily

**Family Care of Farmington**
316NH Route 11  Farmington, NH 03835
(603)755-9801  Fax: (603) 755-9806

*March 4, 2008*
Page 3
Chart Document

---

**BRETT G MCKENZIE**                    Home: (603)817-0856 Office: (603)427-1553
**Male  DOB: 04/21/1971**        **54404-0**      **Ins: BCBS HMO (753) Grp: 340005044**


WELLBUTRIN XL 300 MG TB24 (BUPROPION HCL) 1 tab by mouth daily
ALBUTEROL 90 MCG/ACT AERS (ALBUTEROL) 1 puff q 4-6 hrs prn
CLOBETASOL PROPIONATE 0.05 % CREA (CLOBETASOL PROPIONATE) apply to affected area bid
ADDERALL XR 10 MG CP24 (AMPHETAMINE-DEXTROAMPHETAMINE) 1 tab by mouth daily
CLOTRIMAZOLE 1 % EXT CREA (CLOTRIMAZOLE) apply to affected area bid
CELEXA 10 MG TABS (CITALOPRAM HYDROBROMIDE) 1 by mouth daily

**Plan** fatigue- agree with cutting back methadone, and discussed with him that he cannot cut back to quuickly.
cont adderall for now.  supp counseling provided re-onging depression
**New Orders:** Level 3 Estab [CPT-99213]



}


**Signed by Michael Calamia MD on 01/14/2008 at 8:09 PM**

---

**Family Care of Farmington**
316NH Route 11  Farmington, NH 03835
(603)755-9801  Fax: (603) 755-9806

---

**BRETT G MCKENZIE**
**Male  DOB: 04/21/1971**                54404-0

Home: (603)817-0856 Office: (603)427-1553
**Ins: BCBS HMO (753) Grp: 340005044**

**08/16/2007 - Office Visit: Reason: Multiple Issues**
**Provider: Michael Calamia MD**
**Location of Care: Family Care of Farmington**

## History of Present Illness
**History from:** patient

has had int issues with athlete's foot , worse over last few days.
ongoing behavioral issues with his son.  getting bad.  doesnt want to get out of bed i nthe morning.  "he drives me so nuts".  He went through a rough spell.  he is still going through counseling, remains on his medication.  he is getting no help from his ex-wife.  he is still going to day camp.  having some issues with listening, but no fighting or major behavioral issues.  more verbal abuse from his son.  no motivation.  in real deep rut.  "cant get the motor started".

## Past, Family, and Social History
**Past History (reviewed - no changes required):**
surg hx:vasectomy
R./ metacarpl fx
B carpal tunnel release

**Social History (reviewed - no changes required):**  currently lives with son  who has adhd
daughter from prior marriage who lives in dover
use of alcohol
smoker
works for town of portsmouth

## Risk Factors
**Tobacco use:** current
  **cigarettes:**  1.5 pack(s) per day **for** 20 years
     **Smoking pack-years:** 30

**Readiness to Change**
  **1. Are you thinking about stopping tobacco use?** No
  **2. Would you be interested in talking to the provider on ways?** No

**Skin:** Complains of see HPI.
**Psychiatric:** Complains of see HPI.

## VITAL SIGNS
**Entered weight:** 229 lb.
**Calculated Weight:** 229 lb.
**Temperature:** 97.9 deg F.
**Temperature site:** tympanic
**Pulse rate:** 83
**Vitals measured by:** Betty Cameron, MA

**Blood Pressure:** 128/80 mm Hg  - taken by: Betty Cameron, MA

**Family Care of Farmington**
316NH Route 11 Farmington, NH 03835
(603)755-9801 Fax: (603) 755-9806

*March 4, 2008*
Page 2
Chart Document

**BRETT G MCKENZIE**
**Male DOB: 04/21/1971**                    54404-0

Home: (603)817-0856 Office: (603)427-1553
Ins: BCBS HMO (753) Grp: 340005044

**Allergy list reviewed during this update**

## Physical Examination

**Constitutional:** Alert, no acute distress, well hydrated, well developed, well nourished.
**Skin:** macerated areas between mult toes
**Eyes:** normal sclera and conjunctiva.
**Psych:** Oriented to all spheres, good eye contact, flat affect, depressed mood.

## Assessment
**Status of Existing Problems:**
Assessed TINEA PEDIS as deteriorated - Michael Calamia MD - Signed
Assessed History of DEPRESSION as deteriorated - Michael Calamia MD - Signed
Assessed History of DEPRESSION as deteriorated - Michael Calamia MD
**New Problems:**
TINEA PEDIS (ICD-110.4)

## Plan
**New Medications:**
CLOTRIMAZOLE 1 % EXT CREA (CLOTRIMAZOLE) apply to affected area bid
CELEXA 10 MG TABS (CITALOPRAM HYDROBROMIDE) 1 by mouth daily

**Updated Medication List:**
ASPIRIN 81 MG TABS (ASPIRIN) qd
METHADONE HCL 40 MG TBDP (METHADONE HCL) 1 1/2 tabs by mouth daily
LIPITOR 20 MG TABS (ATORVASTATIN CALCIUM) 1 tab by mouth daily
WELLBUTRIN XL 300 MG TB24 (BUPROPION HCL) 1 tab by mouth daily
ALBUTEROL 90 MCG/ACT AERS (ALBUTEROL) 1 puff q 4-6 hrs prn
CLOBETASOL PROPIONATE 0.05 % CREA (CLOBETASOL PROPIONATE) apply to affected area bid
ADDERALL XR 10 MG CP24 (AMPHETAMINE-DEXTROAMPHETAMINE) 1 tab by mouth daily
CLOTRIMAZOLE 1 % EXT CREA (CLOTRIMAZOLE) apply to affected area bid
CELEXA 10 MG TABS (CITALOPRAM HYDROBROMIDE) 1 by mouth daily

**Plan** tinea- antifungal, call if sympoms persist or worsen
depression- disc options, add celexa, disc poss s.e.,
supp counseling proviided
Time spent with patient greater than 15 minutes over half of which was counseling and coordination of care
**New Orders:** Level 4 Estab [CPT-99214]

**Prescriptions:**
CELEXA 10 MG TABS (CITALOPRAM HYDROBROMIDE) 1 by mouth daily  #30 x 1

**Family Care of Farmington**
316NH Route 11 Farmington, NH 03835
(603)755-9801 Fax: (603) 755-9806

*March 4, 2008*
Page 3
Chart Document

---

**BRETT G MCKENZIE**
**Male DOB: 04/21/1971**                    **54404-0**

Home: (603)817-0856 Office: (603)427-1553
Ins: BCBS HMO (753) Grp: 340005044

---

Entered and Authorized by:     Michael Calamia MD
Signed by:        Michael Calamia MD on 08/16/2007
Method used:    Printed then faxed to ...
                     WALMART - ROCHESTER
                     116 Farmington Rd
                     Rochester, NH  03867
                     Ph: 603-332-8438
                     Fax: 332-8438,,,,,4
CLOTRIMAZOLE 1 % EXT CREA (CLOTRIMAZOLE) apply to affected area bid  #30 gram x 1
        Entered and Authorized by:     Michael Calamia MD
        Signed by:        Michael Calamia MD on 08/16/2007
        Method used:    Printed then faxed to ...
                     WALMART - ROCHESTER
                     116 Farmington Rd
                     Rochester, NH  03867
                     Ph: 603-332-8438
                     Fax: 332-8438,,,,,4

**Signed by Michael Calamia MD on 08/20/2007 at 7:28 PM**

---

**Family Care of Farmington**
316NH Route 11  Farmington, NH 03835
(603)755-9801 Fax: (603) 755-9806

*March  4, 2008*
Page 1
Chart Document

---

**BRETT G MCKENZIE**
**Male  DOB: 04/21/1971**                    54404-0

Home: (603)817-0856 Office: (603)427-1553
Ins: BCBS HMO (753) Grp: 340005044

**06/01/2007 - Office Visit: med rev**
**Provider: Michael Calamia MD**
**Location of Care: Family Care of Farmington**

## History of Present Illness
**History from:** patient

**Chief Complaint:** Review and update of medical problems and medications. med rev
son's behavior has been up and down, worse since his mom had short admission in portsmouth pavilion.
he felt that he has been drained since then.  energy level extremely poor.  was even having trouble getting to work
on time.  pt has no real time for himself.  not really interested in activities like fishing that he used to enjoy.
ongoing shoulder aches, feels more muscular.

## Past, Family, and Social History
**Past History (reviewed - no changes required):**
surg hx:vasectomy
R./ metacarpl fx
B carpal tunnel release

**Social History (reviewed - no changes required):**  currently lives with son  who has adhd
daughter from prior marriage who lives in dover
use of alcohol
smoker
works for town of portsmouth

## Risk Factors
**Tobacco use:** current
   **cigarettes:**  1.5 pack(s) per day **for** 20 years
      **Smoking pack-years:** 30

**Readiness to Change**
   **1. Are you thinking about stopping tobacco use?** Yes
   **2. Would you be interested in talking to the provider on ways?** No
..............................................Tabatha Irvine MA June  1, 2007 4:17 PM

## Review of Systems
**Cardiovascular:** Denies exertional chest pain.
**Respiratory:** Denies dyspnea.

## VITAL SIGNS
**Entered weight:** 225 lb., 4 oz.
**Calculated Weight:** 225.25 lb.
**Pulse rate:** 99
**Pulse rhythm:** regular
**Respirations:** 14
**Vitals measured by:** Tabatha Irvine MA

**Family Care of Farmington**
316NH Route 11 Farmington, NH 03835
(603)755-9801 Fax: (603) 755-9806

*March 4, 2008*
Page 2
Chart Document

---

**BRETT G MCKENZIE**                          Home: (603)817-0856 Office: (603)427-1553
**Male  DOB: 04/21/1971**           54404-0        Ins: BCBS HMO (753) Grp: 340005044

---

## BLOOD PRESSURE
Standard
**Cuff Size:** large adult
**Blood Pressure:** 124/78 mm Hg  - taken by: Tabatha Irvine MA

**Allergy list reviewed during this update**

Medications reviewed.  No changes reported.
Tabatha Irvine MA  June  1, 2007 4:17 PM
NKDA
..............................................Tabatha Irvine MA June  1, 2007 4:17 PM

## Physical Examination

**Constitutional:** Alert, no acute distress, well hydrated, well developed, well nourished.
**Eyes:** normal sclera and conjunctiva.
**Neck:** supple, no adenopathy.

## Assessment
**Status of Existing Problems:**
Assessed FATIGUE as deteriorated - Michael Calamia MD
Assessed History of  DEPRESSION as deteriorated - Michael Calamia MD
**New Problems:**
FATIGUE (ICD-780.79)

## Plan
**New Medications:**
ADDERALL 10 MG TABS (AMPHETAMINE-DEXTROAMPHETAMINE) 1 tab by mouth daily

**Updated Medication List:**
ASPIRIN 81 MG TABS (ASPIRIN) qd
METHADONE HCL 40 MG TBDP (METHADONE HCL) 1 1/2 tabs by mouth daily
LIPITOR 20 MG TABS (ATORVASTATIN CALCIUM) 1 tab by mouth daily
WELLBUTRIN XL 300 MG TB24 (BUPROPION HCL) 1 tab by mouth daily
ALBUTEROL 90 MCG/ACT AERS (ALBUTEROL) 1 puff q 4-6 hrs prn
CLOBETASOL PROPIONATE 0.05 % CREA (CLOBETASOL PROPIONATE) apply to affected area bid
ADDERALL 10 MG TABS (AMPHETAMINE-DEXTROAMPHETAMINE) 1 tab by mouth daily

**Plan** disc his ongoing symptoms of depression and poor motivation.  supp counseling provided.  disc med changes, pt will consider
Time spent with patient greater than 15 minutes over half of which was counseling and coordination of care
**New Orders:** Level 3 Estab [CPT-99213]

**Family Care of Farmington**
316NH Route 11  Farmington, NH 03835
(603)755-9801  Fax: (603) 755-9806

*March 4, 2008*
Page 3
Chart Document

---

**BRETT G MCKENZIE**                                          Home: (603)817-0856 Office: (603)427-1553
**Male  DOB: 04/21/1971**                          **54404-0**     **Ins: BCBS HMO (753) Grp: 340005044**

---

**Prescriptions:**
ADDERALL 10 MG TABS (AMPHETAMINE-DEXTROAMPHETAMINE) 1 tab by mouth daily  #30 x 0
    Entered and Authorized by:     Michael Calamia MD
    Signed by:      Michael Calamia MD on 06/01/2007
    Method used:    Printed then faxed to ...
                WALMART - ROCHESTER
                116 Farmington Rd
                Rochester, NH  03867
                Ph: 603-332-8438
                Fax: 332-8438,,,,,4

**Signed by Michael Calamia MD on 06/05/2007 at 8:37 AM**

---

**Family Care of Farmington**
316NH Route 11 Farmington, NH 03835
(603)755-9801 Fax: (603) 755-9806

*March 4, 2008*
Page 1
Chart Document

---

**BRETT G MCKENZIE**
**Male DOB: 04/21/1971**

54404-0

Home: (603)817-0856 Office: (603)427-1553
Ins: BCBS HMO (753) Grp: 340005044

---

**02/06/2007 - Office Visit: 1 mo f/u med rev**
**Provider: Michael Calamia MD**
**Location of Care: Family Care of Farmington**

## History of Present Illness
**History from:** patient

**Chief Complaint:** Review and update of medical problems and medications. 1 mo f/u med rev
son with escalating behavioral issues, recently diagnosed with adhd. which is wearing on him quite a bit. because
of this he feels like his retreating even more into himself. his mom recently moved to nm in her rv, and he is
having issues with his relationship with her.
reports problems with really bad dry skin especially i nhands this time of year. has been using vitamins.
pain issues stable, compliant with chol meds, just hasnt gottne around to getting repeat labs done

## Past, Family, and Social History
**Past History (reviewed - no changes required):**
surg hx:vasectomy
R./ metacarpl fx
B carpal tunnel release

**Family History (reviewed - no changes required):** father djd
mother good
sister good
brother good
mgf- first mi age 42, dm
pat uncle- angioedema
pgparents-cad
**Social History:** currently lives with son who has adhd
daughter from prior marriage who lives in dover
use of alcohol
smoker
works for town of portsmouth

## Review of Systems
**Cardiovascular:** Denies exertional chest pain.
**Respiratory:** Denies dyspnea.

## VITAL SIGNS
**Entered weight:** 224 lb., 4 oz.
**Calculated Weight:** 224.25 lb.
**Pulse rate:** 103
**Pulse rhythm:** regular
**Respirations:** 16
**Vitals measured by:** Tabatha Irvine MA

## BLOOD PRESSURE
Standard

**Family Care of Farmington**
316NH Route 11 Farmington, NH 03835
(603)755-9801 Fax: (603) 755-9806

---

**BRETT G MCKENZIE**
**Male DOB: 04/21/1971**

54404-0

Home: (603)817-0856 Office: (603)427-1553
Ins: BCBS HMO (753) Grp: 340005044

---

**Cuff Size:** large adult
**Blood Pressure:** 118/74 mm Hg  - taken by: Tabatha Irvine MA

**Allergy list reviewed during this update**
…….......................................................Tabatha Irvine MA February  6, 2007 4:04 PM
Medications reviewed.  No changes reported.
Tabatha Irvine MA  February  6, 2007 4:04 PM
NKDA
…….......................................................Tabatha Irvine MA February  6, 2007 4:05 PM

**Physical Examination**

**Constitutional:** Alert, no acute distress, well hydrated, well developed, well nourished.
**Skin:** dry cracked thickend skin on hands mostly palmar side
**Eyes:** normal sclera and conjunctiva.
**Neck:** supple, no adenopathy.
**Cardiovascular:** RRR.
**Respiratory:** CTA bilat, no wheezes, rales or rhonchi, moving air well bilat

**Assessment**
**Status of Existing Problems:**
Assessed DYSHIDROTIC ECZEMA as deteriorated - Michael Calamia MD
Assessed History of  HYPERCHOLESTEROLEMIA as improved - Michael Calamia MD
Assessed History of  DEPRESSION as unchanged - Michael Calamia MD
**New Problems:**
DYSHIDROTIC ECZEMA (ICD-705.81)

**Plan**
**New Medications:**
CLOBETASOL PROPIONATE 0.05 % CREA (CLOBETASOL PROPIONATE) apply to affected area bid

**Updated Medication List:**
ASPIRIN 81 MG TABS (ASPIRIN) qd
METHADONE HCL 40 MG TBDP (METHADONE HCL) 1 1/2 tabs by mouth daily
LIPITOR 20 MG TABS (ATORVASTATIN CALCIUM) 1 tab by mouth daily
WELLBUTRIN XL 300 MG TB24 (BUPROPION HCL) 1 tab by mouth daily
ALBUTEROL 90 MCG/ACT AERS (ALBUTEROL) 1 puff q 4-6 hrs prn
CLOBETASOL PROPIONATE 0.05 % CREA (CLOBETASOL PROPIONATE) apply to affected area bid

**Plan** eczema- high pot steroid cream, rec using twice a day until better ,then stopping, warned about using
elsewhere or long term use
anx/dep-stable, supp counseling provided
chol- cont lipitor, needs labs to assess efficacy
**New Orders:** TdaP vaccine IM, for adult >18 yo (office supp'd) [CPT-90715]

**Family Care of Farmington**
316NH Route 11 Farmington, NH 03835
(603)755-9801 Fax: (603) 755-9806

*March 4, 2008*
Page 3
Chart Document

---

**BRETT G MCKENZIE**                              Home: (603)817-0856 Office: (603)427-1553
**Male DOB: 04/21/1971**          54404-0          Ins: BCBS HMO (753) Grp: 340005044

---

Level 4 Estab [CPT-99214]


**Tetanus update:** Given as Tdap - Adacel (02/06/2007)


**Prescriptions:**
CLOBETASOL PROPIONATE 0.05 % CREA (CLOBETASOL PROPIONATE) apply to affected area bid  #30
gram x 1
     Entered and Authorized by:    Michael Calamia MD
     Signed by:    Michael Calamia MD on 02/06/2007
     Method used:    Printed then faxed to ...
          WALMART - ROCHESTER
          116 Farmington Rd
          Rochester, NH  03867
          Ph: 603-332-8438
          Fax: 332-8438,,,,,4



**Td Booster**
**Td Booster:** Given as Tdap - Adacel   **Manufacturer:** Sanfoi Pastur   **Lot:** c2644aa Jun.02.2009   **By:** TI
**Route/Site:** IM R deltoid
**CONSENT PROCESS**
-Denies hx of severe allergic reactions to this vaccine
-Patient is NOT moderately or severely ill
-Vaccine Information Sheet given & explained to patient/parent/guardian
**VIS Date:** 07/12/2006
**Reviewed with patient by:** T.Irvine MA
...........................................................Tabatha Irvine MA February  6, 2007 4:07 PM


**Signed by Michael Calamia MD on 02/07/2007 at 9:37 AM**

**Family Care of Farmington**
316NH Route 11  Farmington, NH 03835
(603)755-9801  Fax: (603) 755-9806

---

**BRETT G MCKENZIE**
**Male  DOB: 04/21/1971**                    54404-0

Home: (603)817-0856 Office: (603)427-1553
Ins: BCBS HMO (753) Grp: 340005044

**10/04/2006 - Office Visit: CPE non-fasting**
**Provider: Michael Calamia MD**
**Location of Care: Family Care of Farmington**

### History of Present Illness
**History from:** patient

**Chief Complaint:** Review and update of medical problems and medications, health maintenance. CPE non-fasting
has been out of lipitor and wellbutrin for the past month.  feels less tired since not takign the wellbutrin.
son not dealing well with seeing his mom less.
mental health an ongoing issue.  not sleeping well.  anxious, worrying about things.ruminating.  feels like he is just waiting for more bad things to happen.
  feels like he is getting the short end of the stick on many different things.  auto repair issues, money issues.
currently moved to rye to be closer to son and work.
ongoing worries about weight, feeling bloated, hungry, binging at nightime on junk food. eting less meals due to bloated feeling when he eats real meals.

### Past, Family, and Social History
**Past History (reviewed - no changes required):**
surg hx:vasectomy
R./ metacarpl fx
B carpal tunnel release

**Family History:** father djd
mother good
 sister good
brother good
mgf- first mi age 42, dm
pat uncle- angioedema
pgparents-cad
**Social History:** currently lives with son  whoihas adhd
use of alcohol
smoker
works for town of portsmouth

### Review of Systems
**Musculoskeletal:** mid back pain, stiffness, sometimes some lower back locks as well

### VITAL SIGNS
**Entered weight:** 222 lb., 0 oz.
**Calculated Weight:** 222 lb.
**Height:** 68.75 in.
**Pulse rate:** 102
**Pulse rhythm:** regular
**Respirations:** 16
**Body Mass Index:** 33.14

**Family Care of Farmington**
316NH Route 11 Farmington, NH 03835
(603)755-9801 Fax: (603) 755-9806

*March 4, 2008*
Page 2
Chart Document

---

**BRETT G MCKENZIE**
**Male DOB: 04/21/1971**                 54404-0

Home: (603)817-0856 Office: (603)427-1553
Ins: BCBS HMO (753) Grp: 340005044

**Vitals measured by:** Tabatha Irvine MA

## BLOOD PRESSURE
Standard
**Cuff Size:** large adult
**Blood Pressure:** 128/86 mm Hg  - taken by: Tabatha Irvine MA

## Visual Acuity
**Vision tested:** without correction

### OD:
**20/** 15

### OS:
**20/** 15

### OU:
**20/** 13
**Color vision testing** Blue/Green color blind
................................Tabatha Irvine MA  October  4, 2006 2:42 PM

## Physical Examination

**Constitutional:**   gen: a/o x 3, wd/wn, nad
psych: affect appropriate, no psychomotor agitation/edpression
heent:ncat, perrla, eomi
tm: no erythema, good light reflex
pharynx: no erythema or exudate
neck:supple, no lad, thyromegaly, jvd
cor:  rr, no m/r/g, no s3 s4
lungs: cta b, no r/r/w
 abd: soft, nt/nd, nabs, no hsm
ext:  dtr 2 + equal, dp/pt 2 + equal, no c/c/e
skin: no rashes or suspicious lesions
musculoskeletal:  motor 5/5 equal, sensory intact
neuro: cn 2-12 intact, no focal lesions

## Assessment
**Status of Existing Problems:**
Assessed History of  DEPRESSION as deteriorated - Michael Calamia MD
**New Problems:**
WELL ADULT EXAM (ICD-V70.0)

**Family Care of Farmington**
316NH Route 11  Farmington, NH 03835
(603)755-9801  Fax: (603) 755-9806

---

**BRETT G MCKENZIE**                                       Home: (603)817-0856 Office: (603)427-1553
**Male  DOB: 04/21/1971**                 **54404-0**      Ins: BCBS HMO (753) Grp: 340005044

## Plan
**New Medications:**
ALBUTEROL 90 MCG/ACT AERS (ALBUTEROL) 1 puff q 4-6 hrs prn

**Updated Medication List:**
ASPIRIN 81 MG TABS (ASPIRIN) qd
METHADONE HCL 40 MG TBDP (METHADONE HCL) 1 1/2 tabs by mouth daily
LIPITOR 20 MG TABS (ATORVASTATIN CALCIUM) 1 tab by mouth daily
WELLBUTRIN XL 300 MG TB24 (BUPROPION HCL) 1 tab by mouth daily
ALBUTEROL 90 MCG/ACT AERS (ALBUTEROL) 1 puff q 4-6 hrs prn

**Plan** hm-    Reviewed the importance of healthy lifestyle habits, including proper diet and regular exercise. repeat chol labs whhen back on meds for at least one month
anx/dep- strongly rec pt go back on medication, if not wellbutrin should try something else, pt agrees to restart wellbutrin, will contact if fatigue restarts
**New Orders:** Prev Serv 18-39 yr Estab (V70.0) [CPT-99395]

## Prescriptions:
ALBUTEROL 90 MCG/ACT AERS (ALBUTEROL) 1 puff q 4-6 hrs prn  #1 x 3
        Entered and Authorized by:      Michael Calamia MD
        Signed by:      Michael Calamia MD on 10/04/2006
        Method used:    Printed then faxed to ...
                        WALMART - ROCHESTER
                        116 Farmington Rd
                        Rochester, NH  03867
                        Ph: 603-332-8438
                        Fax: 332-8438,,,,,4
    WELLBUTRIN XL 300 MG TB24 (BUPROPION HCL) 1 tab by mouth daily  #90 x 3
        Entered and Authorized by:      Michael Calamia MD
        Signed by:      Michael Calamia MD on 10/04/2006
        Method used:    Printed then faxed to ...
                        WALMART - ROCHESTER
                        116 Farmington Rd
                        Rochester, NH  03867
                        Ph: 603-332-8438
                        Fax: 332-8438,,,,,4
    LIPITOR 20 MG TABS (ATORVASTATIN CALCIUM) 1 tab by mouth daily  #90 x 3
        Entered and Authorized by:      Michael Calamia MD
        Signed by:      Michael Calamia MD on 10/04/2006
        Method used:    Printed then faxed to ...
                        WALMART - ROCHESTER
                        116 Farmington Rd
                        Rochester, NH  03867
                        Ph: 603-332-8438
                        Fax: 332-8438,,,,,4

**Family Care of Farmington**
316NH Route 11  Farmington, NH 03835
(603)755-9801  Fax: (603) 755-9806

---

**BRETT G MCKENZIE**                                    Home: (603)817-0856 Office: (603)427-1553
**Male  DOB: 04/21/1971**                 **54404-0**    Ins: BCBS HMO (753) Grp: 340005044

**Signed by Michael Calamia MD on 10/04/2006 at 9:02 PM**

---

**Family Care of Farmington**
316NH Route 11  Farmington, NH 03835
(603)755-9801  Fax: (603) 755-9806

*March 4, 2008*
Page 1
Chart Document

---

**BRETT G MCKENZIE**
**Male  DOB: 04/21/1971**                    **54404-0**

Home: (603)817-0856 Office: (603)427-1553
Ins: BCBS HMO (753) Grp: 340005044

**02/27/2007 - Lab Report: Basic Metabolic Panel (8)**
**Provider: Michael Calamia MD**
**Location of Care: Frisbie Health Services**

Patient: BRETT MCKENZIE
Note: All result statuses are Final unless otherwise noted.

```
Tests: (1) Basic Metabolic Panel (8) (322758)
  Glucose, Serum          81 mg/dL             65-99      *1
  BUN                     17 mg/dL             5-26       *2
  Creatinine, Serum       1.0 mg/dL            0.5-1.5    *3
  BUN/Creatinine Ratio    17                   8-27       *4
  Sodium, Serum           141 mmol/L           135-148    *5
  Potassium, Serum        4.2 mmol/L           3.5-5.5    *6
  Chloride, Serum         103 mmol/L           96-109     *7
  Carbon Dioxide, Total
                          28 mmol/L            20-32      *8
  Calcium, Serum          9.4 mg/dL            8.5-10.6   *9

Tests: (2) LP without VLDL+Chol/HDL+LD... (030155)
  Cholesterol, Total      184 mg/dL            100-199    *10
  Triglycerides      [H]  209 mg/dL            0-149      *11
  HDL Cholesterol         40 mg/dL             40-59      *12
  LDL Cholesterol Calc [H] 102 mg/dL           0-99       *13

Tests: (3) Comment (012057)
! Comment                 Comment                         *14

If initial LDL-cholesterol result is >100 mg/dL, assess for
risk factors.

Tests: (4) LP without VLDL+Chol/HDL+LD... (030155)
  T. Chol/HDL Ratio       4.6 ratio units      0.0-5.0    *15
! Estimated CHD Risk      0.9 times avg.       0.0-1.0    *16

                       T. Chol/HDL Ratio
                         Men   Women
              1/2 Avg.Risk  3.4    3.3
                  Avg.Risk  5.0    4.4
               2X Avg.Risk  9.6    7.1
               3X Avg.Risk 23.4   11.0
The CHD Risk is based on the T. Chol/HDL ratio.  Other
factors affect CHD Risk such as hypertension, smoking,
diabetes, severe obesity, and family history of pre-
mature CHD.
  LDL/HDL Ratio           2.6 ratio units      0.0-3.6    *17

                          LDL/HDL
                         Men   Women
              1/2 Avg.Risk 1.0    1.5
                  Avg.Risk 3.6    3.2
               2X Avg.Risk 6.3    5.0
               3X Avg.Risk 8.0    6.1
```

**Family Care of Farmington**
316NH Route 11  Farmington, NH 03835
(603)755-9801 Fax: (603) 755-9806

---

**BRETT G MCKENZIE**                    Home: (603)817-0856 Office: (603)427-1553
**Male DOB: 04/21/1971**        54404-0        Ins: BCBS HMO (753) Grp: 340005044

```
Tests: (5) Hepatic Function Panel (7) (322755)
  Protein, Total, Serum
                        7.1 g/dL              6.0-8.5           *18
  Albumin, Serum        4.5 g/dL              3.5-5.5           *19
  Bilirubin, Total      0.2 mg/dL             0.1-1.2           *20
  Bilirubin, Direct     0.06 mg/dL            0.00-0.40         *21
  Alkaline Phosphatase, S
                        68 IU/L               25-150            *22
  AST (SGOT)            32 IU/L               0-40              *23
  ALT (SGPT)            54 IU/L               0-55              *24

Tests: (6) Hgb A1c with MBG Estimation (102525)
  Hemoglobin A1c        5.5 %                 4.8-5.9           *25
```

A1c may be overestimated in diabetic patients exhibiting poor control
and who are also heterozygous or homozygous for HgbS or HgbC. Total
glycohemoglobin is a better indicator of diabetic control in patients
with these hemoglobin variants.
Current guidelines recommend a treatment goal of <7% for diabetic
patients.

```
  Mean Bld Glu Estim.   97 mg/dL                                *26
```

Performed At:  B2, LabCorp Portsmouth
195 Hanover Street  Portsmouth, NH 038010000
Anne Moran MD    Phone:  6034312310

Note: An exclamation mark (!) indicates a result that was not dispersed into the
flowsheet.
Document Creation Date: 02/28/2007 8:27 AM

---

```
(1) Order result status: Final
Collection or observation date-time: 02/27/2007 04:10
Requested date-time:
Receipt date-time: 02/27/2007 00:00
Reported date-time: 02/28/2007 08:24
Referring Physician:
Ordering Physician: M CALAMIA (MCALAMIA)
Specimen Source:
Source: 1100
Filler Order Number: 05832808490 LAB
Lab site: 05832808490
Producer ID *1:B2
Producer ID *2:B2
Producer ID *3:B2
Producer ID *4:B2
Producer ID *5:B2
Producer ID *6:B2
Producer ID *7:B2
Producer ID *8:B2
Producer ID *9:B2

(2) Order result status: Final
```

**Family Care of Farmington**
316NH Route 11 Farmington, NH 03835
(603)755-9801 Fax: (603) 755-9806

---

**BRETT G MCKENZIE**                          Home: (603)817-0856 Office: (603)427-1553
**Male DOB: 04/21/1971**          54404-0          Ins: BCBS HMO (753) Grp: 340005044

---

Collection or observation date-time: 02/27/2007 04:10
Requested date-time:
Receipt date-time: 02/27/2007 00:00
Reported date-time: 02/28/2007 08:24
Referring Physician:
Ordering Physician: M CALAMIA (MCALAMIA)
Specimen Source:
Source: 1100
Filler Order Number: 05832808490 LAB
Lab site: 05832808490
Producer ID *10:B2
Producer ID *11:B2
Producer ID *12:B2
Producer ID *13:B2

(3) Order result status: Final
Collection or observation date-time: 02/27/2007 04:10
Requested date-time:
Receipt date-time: 02/27/2007 00:00
Reported date-time: 02/28/2007 08:24
Referring Physician:
Ordering Physician: M CALAMIA (MCALAMIA)
Specimen Source:
Source: 1100
Filler Order Number: 05832808490 LAB
Lab site: 05832808490
Producer ID *14:B2

(4) Order result status: Final
Collection or observation date-time: 02/27/2007 04:10
Requested date-time:
Receipt date-time: 02/27/2007 00:00
Reported date-time: 02/28/2007 08:24
Referring Physician:
Ordering Physician: M CALAMIA (MCALAMIA)
Specimen Source:
Source: 1100
Filler Order Number: 05832808490 LAB
Lab site: 05832808490
Producer ID *15:B2
Producer ID *16:B2
Producer ID *17:B2

(5) Order result status: Final
Collection or observation date-time: 02/27/2007 04:10
Requested date-time:
Receipt date-time: 02/27/2007 00:00
Reported date-time: 02/28/2007 08:24
Referring Physician:
Ordering Physician: M CALAMIA (MCALAMIA)
Specimen Source:
Source: 1100
Filler Order Number: 05832808490 LAB
Lab site: 05832808490

**Family Care of Farmington**
316NH Route 11  Farmington, NH 03835
(603)755-9801  Fax: (603) 755-9806

*March 4, 2008*
Page 4
Chart Document

---

**BRETT G MCKENZIE**
**Male  DOB: 04/21/1971**                           54404-0

Home: (603)817-0856 Office: (603)427-1553
Ins: BCBS HMO (753) Grp: 340005044

```
Producer ID *18:B2
Producer ID *19:B2
Producer ID *20:B2
Producer ID *21:B2
Producer ID *22:B2
Producer ID *23:B2
Producer ID *24:B2

(6) Order result status: Final
Collection or observation date-time: 02/27/2007 04:10
Requested date-time:
Receipt date-time: 02/27/2007 00:00
Reported date-time: 02/28/2007 08:24
Referring Physician:
Ordering Physician: M CALAMIA (MCALAMIA)
Specimen Source:
Source: 1100
Filler Order Number: 05832808490 LAB
Lab site: 05832808490
Producer ID *25:B2
Producer ID *26:B2
```

**Signed by Michael Calamia MD on 02/28/2007 at 12:01 PM**

---



# Code of Ethics

## Preamble

**Members of the Society of Professional Journalists believe that public enlightenment is the forerunner of justice and the foundation of democracy. The duty of the journalist is to further those ends by seeking truth and providing a fair and comprehensive account of events and issues. Conscientious journalists from all media and specialties strive to serve the public with thoroughness and honesty. Professional integrity is the cornerstone of a journalist's credibility.**

**Members of the Society share a dedication to ethical behavior and adopt this code to declare the Society's principles and standards of practice.**

## Seek Truth and Report It

**Journalists should be honest, fair and courageous in gathering, reporting and interpreting information.**

**Journalists should:**

► Test the accuracy of information from all sources and exercise care to avoid inadvertent error. Deliberate distortion is never permissible.

► Diligently seek out subjects of news stories to give them the opportunity to respond to allegations of wrongdoing.

► Identify sources whenever feasible. The public is entitled to as much information as possible on sources' reliability.

► Always question sources' motives before promising anonymity. Clarify conditions attached to any promise made in exchange for information. Keep promises.

► Make certain that headlines, news teases and promotional material, photos, video, audio, graphics, sound bites and quotations do not misrepresent. They should not oversimplify or highlight incidents out of context.

► Never distort the content of news photos or video. Image enhancement for technical clarity is always permissible. Label montages and photo illustrations.

► Avoid misleading re-enactments or staged news events. If re-enactment is necessary to tell a story, label it.

► Avoid undercover or other surreptitious methods of gathering information except when traditional open methods will not yield information vital to the public. Use of such methods should be explained as part of the story.

► Never plagiarize.

► Tell the story of the diversity and magnitude of the human experience boldly, even when it is unpopular to do so.

► Examine their own cultural values and avoid imposing those values on others.

► Avoid stereotyping by race, gender, age, religion, ethnicity, geography, sexual orientation, disability, physical appearance or social status.

► Support the open exchange of views, even views they find repugnant.

► Give voice to the voiceless; official and unofficial sources of information can be equally valid.

► Distinguish between advocacy and news reporting. Analysis and commentary should be labeled and not misrepresent fact or context.

► Distinguish news from advertising and shun hybrids that blur the lines between the two.

► Recognize a special obligation to ensure that the public's business is conducted in the open and that government records are open to inspection.

## Minimize Harm

**Ethical journalists treat sources, subjects and colleagues as human beings deserving of respect.**

**Journalists should:**

► Show compassion for those who may be affected adversely by news coverage. Use special sensitivity when dealing with children and inexperienced sources or subjects.

► Be sensitive when seeking or using interviews or photographs of those affected by tragedy or grief.

► Recognize that gathering and reporting information may cause harm or discomfort. Pursuit of the news is not a license for arrogance.

► Recognize that private people have a greater right to control information about themselves than do public officials and others who seek power, influence or attention. Only an overriding public need can justify intrusion into anyone's privacy.

► Show good taste. Avoid pandering to lurid curiosity.

► Be cautious about identifying juvenile suspects or victims of sex crimes.

► Be judicious about naming criminal suspects before the formal filing of charges.

► Balance a criminal suspect's fair trial rights with the public's right to be informed.

## Act Independently

**Journalists should be free of obligation to any interest other than the public's right to know.**

**Journalists should:**

► Avoid conflicts of interest, real or perceived.

► Remain free of associations and activities that may compromise integrity or damage credibility.

► Refuse gifts, favors, fees, free travel and special treatment, and shun secondary employment, political involvement, public office and service in community organizations if they compromise journalistic integrity.

► Disclose unavoidable conflicts.

► Be vigilant and courageous about holding those with power accountable.

► Deny favored treatment to advertisers and special interests and resist their pressure to influence news coverage.

► Be wary of sources offering information for favors or money; avoid bidding for news.

## Be Accountable

**Journalists are accountable to their readers, listeners, viewers and each other.**

**Journalists should:**

► Clarify and explain news coverage and invite dialogue with the public over journalistic conduct.

► Encourage the public to voice grievances against the news media.

► Admit mistakes and correct them promptly.

► Expose unethical practices of journalists and the news media.

► Abide by the same high standards to which they hold others.

---

Sigma Delta Chi's first Code of Ethics was borrowed from the American Society of Newspaper Editors in 1926. In 1973, Sigma Delta Chi wrote its own code, which was revised in 1984 and 1987. The present version of the Society of Professional Journalists' Code of Ethics was adopted in September 1996.